## HELVERING, COMMISSIONER OF INTERNAL REVENUE, *v.* GRIFFITHS.

No. 467.   Argued December 7, 1942.—Decided March 1, 1943.

Mr. *Arnold Raum,* with whom *Solicitor General Fahy, Assistant Attorney General Clark,* and *Messrs. Sewall Key* and *Bernard Chertcoff* were on the brief, for petitioner.

Mr. *Roland L. Redmond,* with whom *Mr. Allin H. Pierce* was on the brief, for respondent.

Mr. *John E. Hughes* filed a brief as *amicus curiae,* in support of respondent.

MR. JUSTICE JACKSON delivered the opinion of the Court.

The question in this case is whether the Acts of Congress and the administrative regulations thereunder afford a basis on which we may reconsider the decision in

*Eisner* v. *Macomber*, 252 U. S. 189, and pass on the Government's request that it be overruled.

During the calendar year 1939 respondent owned 101 shares of common stock of the Standard Oil Company of New Jersey. Twice during the year that corporation made appropriate transfers from earned surplus to its capital accounts, in amounts less than the net accumulation of earnings and profits subsequent to February 28, 1913, and against them issued stock dividends. On June 15, 1939, respondent received a dividend of 1.01 such shares having a fair market value of $42.93. On December 15, 1939, she received a further dividend of 1.53 shares, which had a fair market value of $66.08. These dividends were in common stock identical with the stock on which they were declared, which was the only stock outstanding at the time they were made. The dividend stock was not sold, redeemed, or in any way realized upon, and the taxpayer did not include it as income in her return for 1939. The Commissioner did so include it, and on December 8, 1941, sent her a notice of deficiency in the amount of $9.60. The Board of Tax Appeals reversed his determination, and the Circuit Court of Appeals for the Second Circuit affirmed on the authority of *Eisner* v. *Macomber, supra*. 129 F. 2d 321. Because of the importance of the question we granted certiorari.

The tax is asserted under the general provision of § 22 (a) of the Internal Revenue Code that income includes "dividends," together with the specific provision of § 115 (f) (1) that: "A distribution made by a corporation to its shareholders in its stock or in rights to acquire its stock shall not be treated as a dividend to the extent that it does not constitute income to the shareholder within the meaning of the Sixteenth Amendment to the Constitution." [1]

---

[1] 53 Stat. 1, 9, 47. Sec. 22 (a) provides that " 'Gross income' includes gains, profits, and income derived from . . . dividends . . ."

Sec. 115 (a) provides that "The term 'dividend' . . . means any distribution made by a corporation to its shareholders, whether in money or in other property. . . ." 53 Stat. 1, 46.

Was Congress thereby saying that such a dividend as we have here is not being taxed, in view of the *Eisner* v. *Macomber* decision, or was it saying that regardless of that decision it is being taxed? Events which must be considered to determine which Congress intended begin with the enactment of the Revenue Act of 1913, which taxed corporate "dividends" in general but said nothing of stock dividends in particular.[2] The Treasury attempted to tax them, and this Court held that a dividend of common stock paid on stock of the same kind was not income within the meaning of the Act, intimating, however, that as used in the Sixteenth Amendment "income" might have a wider scope. *Towne* v. *Eisner,* 245 U. S. 418 (1918). Congress had meanwhile provided that a "stock dividend shall be considered income, to the amount of its cash value."[3] Under that Act the Commissioner asserted that a dividend in common stock paid on common stock constituted income when received. This Court held it was not income within the meaning of the Sixteenth Amendment, chiefly for the reason that income had not been severed from capital or realized by such a distribution. *Eisner* v. *Macomber,* 252 U. S. 189 (1920). This decision was by a divided Court, Justices Holmes and Brandeis each writing a dissenting opinion, in which respectively Justices Day and Clarke joined. It was promptly and sharply criticised.[4]

---

[2] Sec. II B of this Act, 38 Stat. 114, 167, provided that "net income . . . shall include gains, profits, and income derived from . . . dividends . . ."

[3] § 2 (a) of the Revenue Act of 1916, 39 Stat. 756, 757.

[4] Seligman, Implications and Effects of the Stock Dividend Decision, (1921) 21 Columbia Law Review 313; Warren, Taxability of Stock Dividends as Income, (1920) 33 Harvard Law Review 885; cf. Powell, Constitutional Aspects of Federal Income Taxation, in The Federal Income Tax (Columbia University Lectures, 1921) 51; Ballantine, Corporate Personality in Income Taxation, (1921) 34 Harvard Law Review 573; Powell, Income from Corporate Dividends, (1922) 35 Harvard Law Review 363; Clark, Eisner v. Macomber and Some In-

Although *Eisner* v. *Macomber* dealt only with a dividend of common stock to common stockholders, it was at once accepted as the basis for a broader exemption. The Treasury ruled that receipt of dividend stock generally was not income, and Congress provided in § 201 (d) of the Revenue Act of 1921 that "A stock dividend shall not be subject to tax . . ." [5] Treasury Regulations under this statute and subsequent reënactments construed it as covering all dividends paid in stock of the distributing corporation.[6]

There the matter stood for nearly fifteen years, although in the meantime this Court pointed out in reorganization cases that a distinction existed between the type of stock dividend before it in *Eisner* v. *Macomber* and one which gave the stockholder a different stock, or different proportionate interests, than before. *United States* v. *Phellis,* 257 U. S. 156 (1921); *Rockefeller* v. *United States,* 257 U. S. 176 (1921); *Cullinan* v. *Walker,* 262 U. S. 134 (1923); *Weiss* v. *Stearn,* 265 U. S. 242 (1924); *Marr* v. *United States,* 268 U. S. 536 (1925).

---

come Tax Problems, (1920) 29 Yale Law Journal 735. But cf. Fairchild, The Stock Dividend Decision, (1920) 5 National Tax Association Bulletin 208.

[5] T. D. 3052, 3059, 3 Cum. Bull. 38; O. D. 732, 3 Cum. Bull. 39; O. D. 801, 4 Cum. Bull. 24; 42 Stat. 227, 228. The House Report stated that this Act modified "the definition of dividends in existing law by exempting stock dividends from the income tax, as required by the decision of the Supreme Court in *Eisner* v. *Macomber.*" H. R. Rep. No. 350, 67th Cong., 1st Sess., pp. 8–9. The Senate Report was to the same effect. S. Rep. No. 275, 67th Cong., 1st Sess., p. 9.

[6] See Article 1548, Treasury Regulations 62 (promulgated under the Revenue Act of 1921), 65 (promulgated under the Revenue Act of 1924) and 69 (promulgated under the Revenue Act of 1926); Article 628, Treasury Regulations 74 (promulgated under the Revenue Act of 1928) and 77 (promulgated under the Revenue Act of 1932); Article 115–8 of Treasury Regulations 86 (promulgated under the Revenue Act of 1934).

Inaction did not mean, however, that persons who received stock dividends were escaping all support of the revenues. Taxation was only postponed, as is taxation of many securities taken in corporate reorganizations, until sale or other realization has occurred. Their proceeds when realized have always been taxable as income. The Treasury had come to compute the postponed tax under Regulations which as to some classes of stock apportioned the cost basis between the old stock and the dividend stock in accordance with their respective fair market values at the time the stock dividend was issued.[7] On March 30, 1936, this Court granted certiorari in *Koshland* v. *Helvering,* 298 U. S. 441, in which the taxpayer challenged the validity of the apportionment Regulations. 297 U. S. 702. She had owned certain preferred stock and had received a dividend of common shares thereon. The preferred was thereafter redeemed, and the Commissioner applied the allocation rule, which reduced the cost basis of this old stock. This, of course, increased her gain on the redemption of the old stock and added to her tax. She argued that her dividend, notwithstanding *Eisner* v. *Macomber,* to which she gave a narrow reading, was constitutionally taxable as income at the time received. The Court held unanimously and squarely that the dividend in question did constitute income within the Sixteenth Amendment, and in effect limited *Eisner* v. *Macomber* to the kind of dividend there dealt with. But it did not overrule that decision or question its authority as to dividends such as we have in this case. With two Justices dissenting it struck down the apportionment regulations as being beyond statutory authorization.

---

[7] Article 1548, Treasury Regulations 62; Articles 1548, 1599, Treasury Regulations 65 and 69; Articles 600, 628, Treasury Regulations 74.

While the Court was considering stock dividends in the *Koshland* case, Congress was considering them in connection with the pending Revenue Act for 1936.

On March 3, 1936, the President had suggested the enactment of a tax upon the undistributed income of corporations.[8] On March 26, 1936, and while the taxpayer's petition for certiorari in the *Koshland* case was pending, a Subcommittee of the House Ways and Means Committee recommended that such a tax be enacted in lieu of the existing capital-stock, excess-profits, and income taxes on corporations.[9] It was thought by some authorities that imposition directly upon shareholders of a tax based on their pro rata shares of corporate earnings would be more satisfactory than the undistributed-profits tax.[10] Serious consideration of this method, which had been employed in

---

[8] H. Doc. No. 418, 74th Cong., 2d Sess., pp. 2–3.

[9] H. R. Committee Print, March 26, 1936, 74th Cong., 2d Sess., Hearings on the Revenue Act, 1936, House Ways and Means Committee, 74th Cong., 2d Sess., pp. 5–8.

[10] See statement of Congressman Vinson, 83 Cong. Rec. 2780: "After the decision of the Supreme Court in 1920, it was no longer possible for us to impose a tax upon the shareholder with respect to the undivided profits of a domestic corporation. We were forced to adopt the system of levying a special penalty tax on the corporation itself, which has been exceedingly difficult to enforce in the courts and is nothing like as effective as if we could ignore the corporation and tax the shareholder direct upon his undistributed earnings in the profits of the corporation."

See also, Hearings on the Revenue Act, 1936, House Ways and Means Committee, 74th Cong., 2d Sess., pp. 193, 745; cf. Hearings on the Revenue Act, 1936, Senate Finance Committee, 74th Cong., 2d Sess., pp. 210–211, 256–257; H. R. Rep. No. 1860, 75th Cong., 3d Sess., pp. 2–3; Report of Subcommittee of the House Committee on Ways and Means, Proposed Revision of the Revenue Laws, 75th Cong., 3d Sess., January 14, 1938, pp. 2–3. For earlier proposals, see statement of Oliphant, General Counsel of the Treasury, Hearings on the Revenue Act, 1936, House Ways and Means Committee, 74th Cong., 2d Sess., p. 658; *id.* at 820; Martin, Taxation of Undistributed Corporate Profits, (1936) 35 Michigan Law Review 44, 45 *et seq.*

earlier times,[11] was foreclosed by the belief that *Eisner* v. *Macomber* made it "impossible" to put into effect.[12]

---

[11] The Revenue Act of 1864, 13 Stat. 218, 282, provided that "gains and profits of all companies, whether incorporated or partnership, . . . shall be included in estimating the annual gains, profits, or income of any person entitled to the same, whether divided or otherwise." Compare *The Collector* v. *Hubbard*, 12 Wall. 1, 17, with *Pollock* v. *Farmers' Loan & Trust Co.*, 158 U. S. 601, and *Eisner* v. *Macomber*, 252 U. S. 189, 218, 230–232. See also, 13 Stat. 480; 14 Stat. 5, 478; 16 Stat. 258.

[12] Congressman Hill objected to a proposal that stockholders be taxed like partners, on the ground that *Eisner* v. *Macomber* stood in the way. Hearings on the Revenue Act, 1936, House Ways and Means Committee, 74th Cong., 2d Sess., pp. 96, 97, 98. Congressman Lewis stated: "I do not know that it is fully understood by the public that this roundabout device of compelling the distribution of the real income of the corporation to its shareholders, so that the shareholders may be called upon to pay taxes upon their income, is due to a decision of a divided court. Some years ago the Supreme Court in a sharp decision determined that we could not do in the United States with regard to earned dividends that were not distributed what they do in other countries, especially in England, require the shareholder to pay his tax on his income just the same whether his company had refused to distribute it or not.

"Now, if that decision of the Court should be reversed, what we are doing here, or attempting to do in order to reach the taxpayer here, the method of our attempt, would not be necessary. Not ours the fault of all this clumsiness and indirection of approach to a necessary public object." *Id.* at 193.

Later he said: "Of course, we cannot reach the net earnings of the corporations as earnings of the individual stockholders until the earnings are distributed as dividends." *Id.* at 321. See also, *id.* at 745, 83 Cong. Rec. 3125.

In the Senate debates, Senator Black stated in response to a question whether it was "legally possible to say to each corporation, 'Make a report of the proportionate earnings of each stockholder,' as we would to a partnership, and then let the stockholder make his return?" that "Unfortunately that was done about 60 years ago, and while it is my recollection that the Supreme Court itself sustained the act, it later, by another divided opinion, changed its mind and struck down the act as being in contravention of the Constitution. So that it is impossible to tax the undistributed profits which remain in the corporate Treasury as

The statements of members of Congress and of responsible Treasury officials at the hearings and debates on the Act are at variance with the present assertion of the Government that Congress intended § 115 (f) (1) to challenge or override the decision to which it had in other sections of the Act accommodated itself.

At the hearings of the Congressional Committees the proposed tax was attacked as being a measure which would have the effect of forcing the distribution by corporations of assets needed in their business. Its supporters anticipated the decision of this Court in the *Koshland* case and countered with statements that dividends taxable as income to the shareholders—which would have the effect of avoiding the undistributed-profits tax on the corporation [13]—could be declared and the undistributed-profits tax avoided without the necessity of distributing assets.[14] No testimony was given, however, that divi-

a part of the individual incomes of the stockholders." 80 Cong. Rec. 8813.

Compare colloquy between Congressman Lewis and Alvord, *infra*, note 37; *Helvering* v. *National Grocery Co.*, 304 U. S. 282; *Heiner* v. *Mellon*, 304 U. S. 271; *Helvering* v. *Gerhardt*, 304 U. S. 405, 425. But see Powell, The Stock-Dividend Decision and the Corporate Nonentity, (1920) 5 National Tax Association Bulletin 201; Clark, *supra*, note 4, at 742; Traynor, Tax Decisions of the Supreme Court, 1937 Term, (1938) 33 Illinois Law Review 371, 388.

[13] Sec. 27 (f) of H. R. 12395, 74th Cong., 2d Sess., which became § 27 (e) of the Revenue Act of 1936, 49 Stat. 1648, 1665.

[14] In questioning Kent, Acting Chief Counsel of the Bureau of Internal Revenue, at the House hearings, Congressman Vinson of Kentucky said: "in reference to the retention of the cash in the business by the use of taxable stock dividends, I would like you to develop that, because I think it is very interesting. I think that it will allay a major portion of the fear that some folks have that in this favored treament of corporations declaring large percentages of dividends the capital structure of a corporation would be in danger, or that thereby it would not have the money for the rainy day." Kent replied: "There have been several decisions recently—I may say that one of

dends such as we have in this case were legally taxable or intended to be taxed.[15]

them has now reached the Supreme Court of the United States—that have taken the position that the constitutional immunity of the true stock dividend recognized or declared in *Eisner* v. *Macomber* does not apply to all types and varieties of so-called stock dividends; for instance, that if the directors of a corporation instead of paying a large cash dividend to the preferred shareholders of the corporation see fit to give them common stock instead, that dividend of common stock is taxable so far as the Constitution is concerned.

"I may say that in a case which is pending before the Supreme Court there is a question also of the statutory interpretation, but assuming, as I believe is a proper legal view of the case, that so far as the Constitution is concerned, there are types of stock dividends that may be taxed under the Constitution, that would provide a loophole. Then, also, of course, there is the so-called optional stock dividend in which the stockholder is given the option of taking cash or taking stock. For any shareholder who wishes to maintain his proportionate equity in the enterprise there is a very powerful incentive to take stock." Congressman Vinson said: "Such option is property that has a value and, in your opinion, takes that entirely out of the stock dividend which was involved in the case of *Eisner* v. *Macomber;* is that right?" Mr. Kent: "That is correct." Hearings on the Revenue Act, 1936, House Ways and Means Committee, 74th Cong., 2d Sess., pp. 592–593.

See also, similar statements at the Senate hearings by Haas, Director of Research and Statistics for the Treasury Department; and Oliphant, General Counsel of the Treasury. Hearings on the Revenue Act, 1936, Senate Finance Committee, 74th Cong., 2d Sess., pp. 38, 909, 917–918.

[15] The Government calls attention to a memorandum submitted to the Senate Finance Committee by Graham, Lecturer in Finance at Columbia University, which stated that: "The most suitable method of capitalizing reinvested earnings and making them taxable to the stockholders, would be through the declaration of taxable dividends in common stock. While the decision in *Eisner* v. *Macomber* stands in the way of this ideal arrangement, I believe that in view of the different philosophy of taxation embodied in the pending bill, this decision might be overcome by treating such stock dividends as an administrative vehicle for allocating earnings to the various tax-payers." Hearings on the Revenue Act, 1936, Senate Finance Com-

As reported by the House Ways and Means Committee and passed in the House, § 115 (f) (1) of the bill provided: "A distribution made by a corporation to its shareholders in stock of the corporation or in rights to acquire stock of the corporation shall be treated as a taxable dividend to the extent that such distribution constitutes income to the shareholder within the meaning of the Sixteenth Amendment to the Constitution and represents a distribution of earnings or profits accumulated after February 28, 1913." [16]   The Committee Report stated that: "It is provided in § 115 (f) that stock dividends shall be subject to tax to the extent that such dividends constitute income to the shareholder within the meaning of the sixteenth amendment to the Constitution." [17]

The manager of the Bill, Congressman Vinson of Kentucky, stated on the floor of the House, with reference to § 115 (f) (1): "In no sense is this an attack upon the Eisner against Macomber decision.   There are many dividends received in stock and stock rights that are distinguishable from the character of stock dividend in the *Macomber* case, *supra,* and are actual realized taxable income.   As we see it, a stock dividend that is not taxable is one in which the relative interest of each shareholder of a corporation is unchanged in his stock ownership." [18]   He submitted a legal memorandum furnished by Arthur Kent,

mittee, 74th Cong., 2d Sess., p. 696.  Graham did not testify at the hearings, and it is not clear from this statement that he had reference to a dividend of common stock on common stock.  Compare his later statement in The Undistributed Profits Tax and the Investor, (1936) 46 Yale Law Journal 1, 6, note 17: "Payments on common in additional common are, of course, non-taxable."  Compare Hearings on the Revenue Act, 1936, House Ways and Means Committee, 74th Cong., 2d Sess., pp. 93 *et seq.*

[16] H. R. 12395, 74th Cong., 2d Sess.

[17] H. Rep. No. 2475, 74th Cong., 2d Sess., p. 10.

[18] 80 Cong. Rec. 6214–6215.

Acting Chief Counsel of the Bureau of Internal Revenue, setting forth cases dealing with the taxability of stock dividends, sixteen of which, including *Eisner* v. *Macomber*, had held stock dividends nontaxable, and twelve of which had held that the dividends were not true stock dividends and thus were taxable. This memorandum was in support of Kent's statement in response to Congressman Vinson's questioning at the hearings before the House Ways and Means Committee, to the effect that "the constitutional immunity of the true stock dividend recognized or declared in *Eisner* v. *Macomber* does not apply to all types and varieties of so-called stock dividends." [19] Congressman Vinson called particular and favorable attention to an article approving the decision in *Eisner* v. *Macomber*, published in the same month by Professor Magill, who had served as Special Assistant to the Secretary of the Treasury in tax matters and has also served as Undersecretary of the Treasury.[20] Congressman Vinson reiterated his views on the following day in response to questions by Congressman Treadway, leader of the opposition to the bill.[21]

---

[19] See note 14, *supra.*

[20] Magill, Realization of Income through Corporate Distributions, (1936) 36 Columbia Law Review 519.

[21] Mr. Vinson. The case of Eisner against Macomber, as I recall, involved a corporation with $1,000,000 common stock. There was a declaration of a $500,000 stock dividend to the common-share holders. The Court held, and I think correctly, that where each shareholder got his proportionate part of the new stock there was no change in his ownership in the corporation. That, in a corporation with a million-dollar capital, the distribution of another half million to the holders of the common stock made no change in ownership. The shareholder who owned a share of stock would own one and a half shares in the increased structure, and therefore there was no change in the ownership so far as he and the corporation were concerned.

It has been evidenced throughout the years that there are innumerable stock dividends that are taxable. The issuance of stock, either

The opinion of this Court in the *Koshland* case was announced on May 18, 1936, six days after the Senate Finance

common or preferred, or bonds, in payment of dividends may change the proportion of ownership among the shareholders. For instance, let us take this illustration: You issue preferred stockholders common stock to satisfy dividends declared to preferred stockholders. You have introduced additional common stock. It is in the hands of persons other than the present common-stock holders; consequently there is a change in the proportion of ownership in the common-stock holders.

The Supreme Court in one case laid down the rule that the yardstick in respect of the taxability of stock dividends was the character or kind of stock and the change in proportion of ownership. I submitted in the RECORD yesterday a statement prepared for me by Mr. Kent, Acting General Counsel of the Bureau of Internal Revenue, setting forth decisions of the Supreme Court where stock dividends were held to be nontaxable; and other cases where the Supreme Court and the Board of Tax Appeals held that stock dividends were taxable. In this connection I pointed out that in the April volume of the Columbia University Law Review a gentleman, in whom we have great faith and confidence, the Honorable Roswell Magill, wrote a very comprehensive and illuminating article on the taxability of stock dividends.

Mr. Treadway. . . .

As I recall it, in the present law there was just one line, 115, which read "stock dividends shall not be subject to tax." That is correct?

Mr. Vinson. That is right.

Mr. Treadway. It has been stricken out in this bill, and you are substituting therefor section (f), on page 107, of which the gentleman has given a history.

. . . . .

Mr. Vinson. The section to which I refer states that the only stock dividends we seek to tax are those which are taxable income within the sixteenth amendment.

Mr. Treadway. The language stricken out, I may say, reads as follows:

"(b) Stock dividends: A stock dividend shall not be subject to tax."

That is the existing law and has been the law most of the time since the Eisner against Macomber decision. In the next tax bill after that decision that language was included.

I understand the gentleman's explanation to be that the language of the act was too broad. I do not mean too broad in the sense it is

Committee concluded its hearings. This Committee reported out § 115 (f) (1) in the form in which it is found in the Act: "A distribution made by a corporation to its shareholders in its stock or in rights to acquire its stock shall not be treated as a dividend to the extent that it does not constitute income to the shareholder within the meaning of the sixteenth amendment to the Constitution." It stated in explanation of the change: "This subsection of the House bill, under which stock dividends are made taxable to the full extent permitted by the Constitution, is retained by your committee, except for changes made necessary by virtue of the reported amendment of section 115 (a) and in the interest of greater clarity." [22]

Senators Black and La Follette of the Senate Finance Committee submitted a minority report recommending an increase in the undistributed-profits tax rates, and also that § 115 (f) (1) specifically adopt the formula of the recently decided *Koshland* case, for no apparent reason other than a belief that in its present form it did not clearly have the effect of taxing even the type of stock dividends which the Court held in that case could be taxed.

To this end they recommended that § 115 (f) (1) "Specifically provide that there shall be no undistributed-prof-

not legal, but it goes further than the Eisner against Macomber decision.

Mr. Vinson. That is correct.

Mr. Treadway. The language now substituted for the stricken language describes new stock dividends that can be taxed or what portion of stock dividends under the sixteenth amendment can in the future be taxed. Is that the right conception of the intention?

Mr. Vinson. Well, we take the broad position that stock dividends that are taxable income within the sixteenth amendment are subject to taxation, and if they are not such stock dividends and not any taxable income under the sixteenth amendment, they are not subject to taxes. 80 Cong. Rec. 6309–6310.

[22] S. Rep. No. 2156, 74th Cong., 2d Sess., pp. 18–19.

its tax on stock dividends which are taxable income for the individual recipient because the stock 'gives the stockholder an interest different from that which his former stockholdings represented.' " [23]  In debate on the floor of the Senate, Senator Black said that: "As all Senators know, until about 2 weeks ago it was generally believed that it was impossible to tax stock dividends as income of the recipient of those stock dividends.  About 2 weeks ago, however, the Supreme Court of the United States rendered an opinion which appeared in the Record, in which it decided if those stock dividends were declared in a different type of stock than the stock which was originally held by the owner, that those dividends did constitute actual income—taxable income, if you please—in the hands of the stockholder recipient.

"That being true, we have provided in such manner as to avoid any possible misunderstanding, that stock dividends declared in such manner that they are taxable in the hands of the recipient will be considered as distributed profits against which no undistributed-profits tax is imposed." [24]

Senator Bone asked: "Would it not be possible for corporations to evade the effect of that kind of decision of the Supreme Court by distributing stock of a character that would escape taxation?"  Senator Black answered

---

[23] S. Rep. No. 2156, 74th Cong., 2d Sess., Pt. 2, p. 5, reprinted together with the opinion of this Court in the *Koshland* case, 80 Cong. Rec. 8526–8529.  Their Report stated that: "Under the opinion of the Supreme Court in *Koshland* v. *Helvering*, decided May 18, 1936, the Supreme Court decided that stock dividends represented taxable income where they give 'the stockholder an interest different from that which his former stockholdings represented.'  It is, therefore, beyond any question of doubt, that under our proposal, corporations would be able to retain all money profits needed for carrying on their business without any additional corporate tax."

[24] 80 Cong. Rec. 8811.

that they could, but that they would then be subject to the undistributed-profits tax.[25]

In response to a question by Senator Adams whether it would not be possible to tax stockholders in corporations upon undistributed corporate earnings, as partnerships were taxed upon undistributed partnership earnings, Senator Black stated that this was "impossible," [26] but that "in order to achieve the same result we have suggested a proposal which imposes no corporate tax on undistributed profits if the corporation declares a stock dividend of such nature as to be taxable under the recent Supreme Court opinion. In that case, the case of Koshland against Helvering, the Court distinguished clearly and unequivocally between a normal stock dividend of the same kind and nature as the stock on which the dividend was declared and a stock dividend of a distinctly different nature from the stock on which the dividend was declared. In order to carry out and obtain the full benefit of that, so that we can permit every corporation, if it desires, to retain 100 cents of every dollar in its treasury, if its stockholders wish, we have provided that there shall not be one dollar of corporate undistributed profit tax imposed upon that corporation if it distributes its dividends in a stock dividend which is taxable in the hands of the stockholders." [27]

Senator La Follette said on the floor of the Senate that "under all these measures—under the House bill, under the Senate committee bill, and under this amendment—any corporation desiring to retain 100 percent of its statutory net income free from increased tax may do so by paying out to its stockholders a dividend which is taxable under the sixteenth amendment." [28]

---

[25] 80 Cong. Rec. 8811.

[26] See footnote 12, *supra*.

[27] 80 Cong. Rec. 8813.

[28] 80 Cong. Rec. 9048. See also, *id*. at 9045, 9047.

Senator Robinson stated his approval of the proffered amendment, but suggested that it be withdrawn and the matter taken up in conference. The amendment was accordingly withdrawn, but was not acted upon by the conference.[29]

The meaning of § 115 (f) (1) was critical in the administration both of the undistributed-profits tax upon corporations and of the income tax upon shareholders. This was not its only importance, however. Like the earlier Revenue Acts, the Revenue Act of 1936 contained provisions intended to cope with the problem of evasion of income taxes by shareholders through failure to distribute corporate income.[30] These provisions had been drafted to avoid the limitations set upon Congressional power by

---

[29] 80 Cong. Rec. 9052.

[30] Sec. 102, 49 Stat. 1648, 1676, laid a graduated additional tax upon the income of corporations other than personal holding companies as defined in § 351, formed or availed of for the purpose of preventing the imposition of the surtax upon their shareholders or the shareholders of any other corporation, through the medium of permitting earnings or profits to accumulate instead of being divided or distributed.

Sec. 351, 49 Stat. 1648, 1732, laid a graduated surtax upon income of personal holding companies.

Under the Revenue Acts of 1913, 1916 and 1918, if a corporation was availed of for the purpose of evading taxation by accumulation of gains and profits the shareholders were taxed on their pro rata shares of income, whether or not distributed. 38 Stat. 166; 39 Stat. 758; 40 Stat. 1072.

Sec. 220 of the Revenue Act of 1921 employed instead a tax against the corporation. 42 Stat. 227, 247. H. R. Rep. No. 350, 67th Cong., 1st Sess., pp. 12–13, stated in explanation of the change that: "Section 220 of the existing law provides that if any corporation is formed or availed of for the purpose of evading the surtax upon its stockholders through the medium of permitting its gains and profits to accumulate instead of being divided, the stockholders shall be taxed in the same manner as partners. By reason of the recent decision of the Supreme Court in the stock dividend case (*Eisner* v. *Macomber*, 252 U. S. 189),

*Eisner* v. *Macomber.* It was generally believed that they had failed, and would fail, fully to accomplish their purpose, and that fully effective provisions would entail a challenge of the authority of *Eisner* v. *Macomber.*[31]

In this state of affairs, the Treasury issued Regulations which plainly construed § 115 (f) (1) not as repudiating *Eisner* v. *Macomber* by taxing stock dividends but as exempting them and adopting the existing decisions, including *Eisner* v. *Macomber.* Article 115–7 of Regulations 94, issued under the Revenue Act of 1936, set forth references to the Court's decisions in many cases, and said: "A stock dividend does not constitute income if the new shares confer no different rights or interests than did the old—the new certificates plus the old representing

considerable doubt exists as to the constitutionality of the existing law." See also, S. Rep. No. 275, 67th Cong., 1st Sess., p. 16.

See also, § 220 of the Revenue Acts of 1924 and 1926, 43 Stat. 253, 277; 44 Stat. 9, 34; § 104 of the Revenue Acts of 1928 and 1932, 45 Stat. 791, 814; 47 Stat. 169, 195; and §§ 102 and 351 of the Revenue Act of 1934, 48 Stat. 680, 702, 751.

The 1926 and subsequent Acts permitted the avoidance of tax on the corporation by inclusion of undistributed corporate income in the gross income of its shareholders.

[31] Thus, Senator Black said on the floor of the Senate that "It is a vain and an illusory hope to anticipate that the Government of the United States will ever be able to prevent tax avoidance on the part of corporate officials by the simple expedient of charging and proving against them that they have withheld a distribution of profits to avoid taxes." 80 Cong. Rec. 8811. See also statement by Oliphant, General Counsel of the Treasury, Hearings on the Revenue Act, 1936, House Ways and Means Committee, 74th Cong., 2d Sess., pp. 658–659; footnotes 10 and 12, *supra*; cf. Report of Subcommittee of the House Committee on Ways and Means, Tax Revision, 1938, January 14, 1938, 75th Cong., 3d Sess., pp. 20 *et seq.*; H. R. Rep. No. 1860, 75th Cong., 3d Sess., p. 53; 65 Cong. Rec. 8014 *et seq.*; Martin, Taxation of Undistributed Corporate Profits, (1936) 35 Michigan Law Review 44, 50, 62.

the same proportionate interest in the net assets of the corporation as did the old." Three examples followed, the second relating to a dividend identical with the one before us. The example concluded: "The stock so distributed does not constitute a taxable stock dividend to the shareholders." The Treasury also issued a statement of general policy as to stock dividends, to the effect that it would allow a dividends-paid credit against the undistributed-profits tax with respect to stock dividends which were clearly taxable to stockholders and refuse such credit with respect to stock dividends which were "clearly nontaxable to the shareholder"; and where taxability was a debatable question, it would tentatively allow a dividends-paid credit if the corporation claiming the credit should file proper waivers or agreements to protect the interests of the Government pending final determination of the taxability to shareholders of the distribution, either by closing agreement executed by all shareholders or by a final adjudication in court.[32]

Administration of § 115 (f) (1) was undertaken and continued upon the basis of this construction, and no effort was made to obtain a different one. On the contrary, the Government in this Court took the position that the meaning of § 115 (f) (1) was correctly stated by Congressman Vinson on the floor of the House as quoted *infra,* p. 380.[33]

Other agencies of the Government accepted this same view of the meaning of the statute, authorizing the issuance by corporations subject to their supervision of securities other than common stock, at variance with their usual policy and in order to permit the corporations to

---

[32] I. T. 3037, Cum. Bull. 1937–1, p. 90.

[33] See Government's Brief in *Helvering* v. *Gowran,* 302 U. S. 238, p. 20 (October, 1937).

do what the Treasury assured them was necessary to avoid the payment of undistributed-profits taxes.[34]

The undistributed-profits tax evoked a voluminous literature, which showed almost universal agreement with the correctness of the Treasury's contemporaneous statement of the meaning of the statute.[35]

We think if Congress had passed or intended to pass an Act challenging a well known constitutional decision of this Court there would appear at least one clear statement of that purpose either from its proponents or its adversaries. Not one contemporaneous word in or out of Congress discloses the purpose which the Government says we should find that this legislation accomplished.

Against this background, it was proposed to incorporate an undistributed-profits tax in the pending Revenue Act for 1938. As proposed and enacted, § 115 (f) (1) was the same as in the 1936 Act.[36] Like earlier Acts, the Revenue Act of 1938, as proposed and enacted, contained provisions

---

[34] The Greyhound Corporation—Issuance of Preference Stock, 1 M. C. C. 357; Mission Oil Co., 1 S. E. C. 940; cf. International Paper & Power Co., 2 S. E. C. 274; Southwestern Development Co., 2 S. E. C. 930.

[35] McLaren, Management of Capital Distributions under the Revenue Act of 1936, (1936) 62 Journal of Accountancy, 334, 354–355; Schulman, Undistributed Profits Tax after the Koshland Case, (1936) 14 Tax Magazine 703, 705; Anderson, The Taxability of Stock Dividends, (1937) 15 Tax Magazine 74, 77; Graham, The Undistributed Profits Tax and the Investor, (1936) 46 Yale Law Journal 1, 6–7; Note (1936) 50 Harvard Law Review 332, 334; cf. Hendricks, The Undistributed Profits Tax, (1936) 46 Yale Law Journal 19, 38–41.

In an article published in April of 1940, Surrey, Assistant Legislative Counsel of the Treasury Department, later advanced the contrary view. The Supreme Court and the Federal Income Tax, 35 Illinois Law Review 779, 794.

[36] § 115 (f) (1), H. R. 9682, 75th Cong., 3d Sess.; 52 Stat. 447, 497.

intended to conform with the authority of *Eisner* v. *Macomber*,[37] and it was attacked as embodying the principle

[37] § 102, 52 Stat. 447, 483; § 401, 52 Stat. 447, 557 (similar to § 351 of the Revenue Act of 1936). The Revenue Act of 1938, as proposed and enacted, contained a "consent dividends" provision allowing shareholders to permit the corporation to avoid the undistributed-profits tax by consenting to include in their returns amounts as though actual distributions had been made in cash. § 28, 52 Stat. 447, 470–472. See Report of Subcommittee of House Committee on Ways and Means, Proposed Revision of the Revenue Laws, 75th Cong., 3d Sess., Jan. 14, 1938, pp. 18–20; H. R. Rep. No. 1860, 75th Cong., 3d Sess., pp. 24 *et seq.*

The following colloquy between Alvord, representing the Committee of Federal Finance, Chamber of Commerce of the United States, and Congressman Lewis, took place at the House Hearings. Hearings on the Revenue Act, 1938, House Ways and Means Committee, pp. 505–506:

Mr. Lewis. Do you realize that these extra taxes on the corporations as such, including the personal holding company and the others, are due to the decision in *Eisner* v. *Macomber?*

Mr. Alvord. Yes.

Mr. Lewis. I am just asking that by way of preface.

Mr. Alvord. Yes, sir. I discussed that quite at length, I think, back in 1936.

Mr. Lewis. Unhappily, it is not being discussed at the present time in the press as fully as it should be in order that the procedure of the committee be fairly understood. You will recall, of course, that under that decision, a 5-to-4 decision, it was held that, notwithstanding the general terms of the income-tax amendment, that tax on paid-up stock dividends was unconstitutional.

Now, before I go any further, I want to say that certainly so far as I am concerned there would be no support for any of these extra taxes if that decision were reversed and the earned income of shareholders in corporations were left subject to taxation, just as the earned income of partners is subject to tax, although that income may be plowed into the partnership business.

Mr. Alvord. I think if you will read my testimony back in 1936 you will find that I agree with you absolutely in principle. But bear in mind that we have some very practical problems in addition to consider.

Mr. Lewis. Very well.

of forcing the distribution of needed corporate assets. The rate of the undistributed-profits tax was, however,

Mr. Alvord. Because I do not think you can afford to exempt the corporation entirely for example, which the following of that decision would require.

Mr. Lewis. Now, of course, the general public wants to be fair in this matter, and even your clients realize that the Government of the United States must in some way secure revenues. I am a little curious to know why voices as influential as yours, or especially as the voice of your clients—I read all their reports, profit by them, I am glad to say—have never been raised asking a reversal of that decision so that we can go back and tax shareholders normally as we do other individuals and partners.

All this trouble we are discussing today will disappear in a moment if that result is obtained.

Mr. Alvord. I think, Mr. Lewis, I can explain to you fully why that has not been done up to the present time. If I recall correctly, *Eisner* v. *Macomber* was decided in the late spring of 1921, just while the 1921 act was under consideration, just before it passed; whereupon a specific provision was written into the statute, saying that stock dividends escape taxes; and that provision has stayed in the statute.

Mr. Lewis. Yes.

Mr. Alvord. It has been whittled down, it is true.

Mr. Lewis. Yes. But the decision also carries a provision against taxing even undistributed income to the shareholder.

Mr. Alvord. No; I do not think that is true, Mr. Lewis.

Mr. Lewis. Well, that is the view of others, and that is the view of the committee. If you will provide me a way by which the shareholder in the corporation can be required to pay his taxes like individuals and partners on earned income, I will promise you my support in an effort to repeal all these extra tax provisions.

Mr. Alvord. Well, I think your position is almost unassailable in that respect, Mr. Lewis.

Mr. Lewis. Very well.

Mr. Alvord. It is a position that many of us have taken for a long time.

Mr. Lewis. But will you hear this question in the spirit it is put: Do you not think the Government under such circumstances is under a duty to try in some way to recoup itself for these lost taxes in the shareholder group who would be subject to them? If we are, isn't it natural that we should go to the corporation that is shielding them, in

very materially lower than in the 1936 Act.[38] This would have had the effect of diminishing the amount which would be collected from the corporation as undistributed-profits tax despite the declaration of a nontaxable stock dividend. Despite these factors, again there was not the slightest suggestion of the view that § 115 (f) (1) had made or had intended to make all stock dividends taxable; on the contrary, there was continued recognition of the

most cases, of course, unintentionally, but still go to the corporation and say: "Now please distribute those dividends so that we can get at this shareholder who is dodging his burden under *Eisner* v. *Macomber*? Isn't that all very natural, sir?

Title II of the Revenue Act of 1937 amended the Revenue Act of 1936 by adding § 334, which provided for the inclusion in the gross income of shareholders in foreign personal holding companies the undistributed corporate income. The abuses incident to the employment of this device had been brought out at Hearings before a Joint Committee on Tax Evasion and Avoidance, 75th Cong., 1st Sess. The Committee Reports on the Bill cite the practical necessity for this form of tax in support of its constitutionality. H. R. Rep. No. 1546, 75th Cong., 1st Sess., pp. 13–14; S. Rep. No. 1242, 75th Cong., 1st Sess., pp. 15–16; Report of the Joint Committee on Tax Evasion and Avoidance, House Doc. No. 337, 75th Cong., 1st Sess., pp. 16–19. See statement of Congressman Vinson on the floor of the House, 81 Cong. Rec. 9035: "The philosophy in regard to foreign personal holding companies is based upon the inherent power in the Government to protect itself from devices to avoid and evade its law. The Supreme Court has said that the Congress has the power to regulate interstate rates, and that it can regulate intrastate rates when such exercise of power is to protect the plenary power over interstate rates. We feel certain that the jurisdiction over American taxpayers and income to our citizens, together with the power to protect our revenues are ample legal support for our position." See also, statement of Congressman Treadway, 81 Cong. Rec. 9024.

The foreign personal holding company tax was retained in the Revenue Act for 1938. 52 Stat. 447, 545 *et seq.*

[38] See Report of Subcommittee of the House Committee on Ways and Means, 75th Cong., 3d Sess., pp. 2 *et seq.;* H. R. Rep. No. 1860, 75th Cong., 3d Sess., pp. 4–6; S. Rep. No. 1567, 75th Cong., 3d Sess., pp. 2–5; H. R. Rep. No. 2330, 75th Cong., 3d Sess., pp. 1 *et seq.*, 23.

authority of *Eisner* v. *Macomber*.[39] Section 115 (f) (1) was reënacted while the Treasury Regulation and rulings on its meaning stood unamended and in their original form.[40]

The Treasury adhered to its earlier views of the meaning of § 115 (f) (1) by repromulgating its former Regulation under the Revenue Act of 1938 and under the Internal Revenue Code,[41] and it stood unamended at the time of the receipt of the stock dividends here in question. Congress in 1939 enacted basis provisions incorporating the language of § 115 (f)(1).[42] It was not until November 15, 1940, and after the receipt of the dividends here involved, that the Treasury amended the Regulation, and then only by striking out all after the first sentence.[43] This action followed the decision of this Court in *Helvering* v. *Bruun,* 309 U. S. 461, on March 25, 1940, which rejected the concept that taxable gain could arise only when the taxpayer was able to sever increment from his original capital. It preceded by ten days the decision in *Helvering* v. *Horst,* 311 U. S. 112, which held that there was no exemption from taxation where economic gain is enjoyed "by some event other than the taxpayer's personal receipt of money or property." *Id.* at 116. Each of these deci-

---

[39] See statement of Congressman Vinson of Kentucky on the floor of the House, 83 Cong. Rec. 2780, and colloquy set forth in footnote 37, *supra.*

[40] 52 Stat. 447, 497.

[41] Article 115–7 of Regulations 101; § 19.115–7 of Regulations 103.

[42] § 214 of the Revenue Act of 1939, 53 Stat. 862, 872.

[43] T. D. 5020, Cum. Bull. 1940–2, p. 118, amending § 19.115–7 of Regulations 103, promulgated under the Internal Revenue Code.

Amendment of Regulations 101 and 94 did not come until January 19, 1942, by T. D. 5110, Cum. Bull. 1942–1, p. 160.

As amended, the Regulation read: "A distribution made by a corporation to its shareholders in its stock or in rights to acquire its stock shall be treated as a dividend to the full extent that it constitutes income to the shareholders within the meaning of the sixteenth amendment to the Constitution."

sions undermined further the original theoretical bases of the decision in *Eisner* v. *Macomber*.

The Government says that the time has come when *Eisner* v. *Macomber* must be overruled, and that we should construe § 115 (f) (1) as intended to tax the dividends here in question and thus to require reconsideration of that decision. It should be observed that the question of the constitutional validity of *Eisner* v. *Macomber* is plainly one of the first magnitude, but this is not to say that it is presented in this case. Under our judicial tradition we do not decide whether a tax may constitutionally be laid until we find that Congress has laid it. Unless the tax asserted by the Commissioner has been authorized by Congress, it fails of validity before we even reach the constitutional question. To reach that question we must decide whether Congress intended by § 115 (f) (1) to do what *Eisner* v. *Macomber* squarely held that it could not. We cannot find that it did.

The Government cannot sustain its position on a literal reading of § 115 (f) (1). Unlike the Revenue Act of 1916,[44] it does not state that all stock dividends are taxable. Instead, § 115 (f) (1) qualifies the generality of § 22 (a) by providing that a distribution made in shares of the corporation's stock "shall not be treated as a dividend to the extent that it *does* not constitute income to the shareholder within the meaning of the Sixteenth Amendment. . . ." (Italics supplied.) If the statute is to be literally read, use of "does" instead of some word of futurity indicates that the time of enactment or at the latest the time of receipt of the dividend is the critical one for determining taxability. Under either view these dividends would not be taxable. The parties are agreed that for the purposes of this decision the meaning of the Constitution must be found in the decisions of this Court,

---

[44] See note 3, *supra*.

and when these dividends were received *Eisner* v. *Macomber* fixed the meaning contrary to the Government's position.

The administrative and legislative history of the statute squarely conflict with the Government's position in this case.

The Treasury Regulation issued under § 115 (f) (1) immediately after it was first enacted states in terms that the statute was not intended to lay a tax on the facts of this case and of *Eisner* v. *Macomber*, and the Treasury advised taxpayers by another ruling that some stock dividends were "clearly" nontaxable. In *White* v. *Winchester Club*, 315 U. S. 32, 41, we said that such "substantially contemporaneous expressions of opinion are highly relevant and material evidence of the probable general understanding of the times and of the opinions of men who probably were active in the drafting of the statute."[45] The statute was reënacted in its original form after having been in force for two years, and after a long controversy centering around the meaning of the statute which assumed throughout the correctness of the administrative construction. This Court has denied retroactive effects to amendments to valid Treasury Regulations which have survived reënactment of the statute, even in the absence of any affirmative indication that the subject-matter of the statute and Regulation was called to the attention of Congress.[46] The effect of reënactment in the absence of

---

[45] See also, *Edwards* v. *Darby*, 12 Wheat. 206, 210; *United States* v. *Moore*, 95 U. S. 760, 763; *Fawcus Machine Co.* v. *United States*, 282 U. S. 375, 378; *Norwegian Nitrogen Co.* v. *United States*, 288 U. S. 294, 315.

[46] *Helvering* v. *R. J. Reynolds Tobacco Co.*, 306 U. S. 110; cf. *Helvering* v. *Wilshire Oil Co.*, 308 U. S. 90; *Helvering* v. *Reynolds*, 313 U. S. 428; *White* v. *Winchester Club*, supra.

The problems in this field have evoked extensive commentary. Paul, Use and Abuse of Tax Regulations in Statutory Construction, 49 Yale

such affirmative indications of agreement has been stated in various and not entirely consistent terms.[47] This is a question we do not now need to examine, for there are in this case many indications that Congress was in complete

Law Journal 660, reprinted with some changes in Paul, Studies in Federal Taxation, Third Series (1940), 420; Alvord, Treasury Regulations and the Wilshire Oil Case, 40 Columbia Law Review 252; Surrey, The Scope and Effect of Treasury Regulations under the Income, Estate and Gift Taxes, 88 University of Pennsylvania Law Review 556; Brown, Regulations, Reenactment, and the Revenue Acts, 54 Harvard Law Review 377; Griswold, A Summary of the Regulations Problem, 54 Harvard Law Review 398; Feller, Addendum to the Regulations Problem, 54 Harvard Law Review 1311.

[47] *Helvering* v. *Winmill*, 305 U. S. 79, 83: "Treasury regulations and interpretations long continued without substantial change, applying to unamended or substantially reënacted statutes, are deemed to have received congressional approval and have the effect of law." In *Helvering* v. *R. J. Reynolds Tobacco Co.*, 306 U. S. 110, 116, it was said that: "Since the legislative approval of existing regulations by reënactment of the statutory provision to which they appertain gives such regulations the force of law, we think that Congress did not intend to authorize the Treasury to repeal the rule of law that existed during the period for which the tax is imposed," and the question of the validity of prospective amendment was left open. In *Helvering* v. *Wilshire Oil Co.*, 308 U. S. 90, the Court carefully examined the taxpayer's position for equities and found it wanting; and after citing the *Reynolds Tobacco* case with approval, stated with reference to the view that reënactment of a statute carried legislative approval of its existing valid administrative construction, that: "It does not mean that a regulation interpreting a provision of one act becomes frozen into another act merely by reënactment of that provision, so that that administrative interpretation cannot be changed prospectively through exercise of appropriate rule-making powers." *Id.* at 100. *Helvering* v. *Reynolds*, 313 U. S. 428, qualified the *Reynolds Tobacco* case and distinguished it on the grounds that "The transactions there in question took place at a time when a regulation was in force which expressly negatived any tax liability. The regulation remained outstanding for a long time and was followed by several reënactments of the statute. About five years after the transactions in question took place, the prior regulation was amended so as to impose a tax liability. There are no such circumstances here." *Id.* at 432–433.

agreement with the Treasury on the question of the taxability of the stock dividends here involved. We would think it unquestionable that in this case the Treasury could not retroactively amend the Regulation to the prejudice of the respondent, except for the Government's assertion that it should be disregarded upon the authority of *Helvering* v. *Hallock*, 309 U. S. 106, 121, note 8, and that, in any event, under § 3791 (b) of the Internal Revenue Code the Secretary or Commissioner must be held to have authority in any case to make a retroactive amendment of a Regulation.

The *Hallock* case is clearly inapposite. There it was held that Treasury Regulations issued more than 11 years after the enactment of the governing Revenue Act of 1926,[48] in submission to the decision of this Court in 1935 of the *St. Louis Trust Co.* cases, 296 U. S. 39, 48, could not prevent the Court from overruling those cases on facts entirely antedating them. That Regulation did not purport to construe the meaning of the statute, as did this one, but simply to acknowledge a constitutional limit imposed by this Court upon the operation of a previously enacted statute; it was not in effect when the transactions involved were entered upon; and there had been no reënactment of the statute while the Regulation was in force.

Nor do we concur in the Government's argument that the legislative history of § 3791 (b) of the Internal Revenue Code requires reconsideration of our decision as to the effect of a corresponding provision of the Revenue Act of 1928 in *Helvering* v. *R. J. Reynolds Tobacco Co.*, 306 U. S. 110, 116.[49] We think that in the circumstances of this

[48] T. D. 4729, Cum. Bull. 1937–1, p. 284.

[49] Section 3791 (b) of the Internal Revenue Code provides that: "The Secretary, or the Commissioner with the approval of the Secretary, may prescribe the extent, if any, to which any ruling, regulation, or Treasury Decision, relating to the internal revenue laws, shall be applied without retroactive effect."

This provision has been in its present form since § 506 of the Revenue Act of 1934, 48 Stat. 680, 757, amended § 1108 (a) of the Revenue

case the administrative construction in effect at the time of the receipt of the stock dividends here in issue must be given controlling effect.

---

Act of 1926. It is the final statute of a series intended to relieve the Treasury from the effect of the view that its administrative rulings, like court decisions, must have retroactive as well as prospective operation.

During and after the first World War the Treasury had been burdened with a great volume of tax business. Perfect consistency in rulings was impossible, and the view that each change in administrative construction must be given retroactive effect deprived both the Government and the taxpayers of any assurance that cases once settled would stay settled. See statement by Dr. Adams, Tax Adviser to the Treasury, Hearings, Revenue Revision, House Ways and Means Committee, 67th Cong., 3d Sess., pp. 38–40; H. R. Rep. No. 1035, 66th Cong., 2d Sess., p. 3.

To remedy this situation Congress provided in § 1314 of the Revenue Act of 1921, 42 Stat. 227, 314, that: "in case a regulation or Treasury decision" should be reversed by a subsequent "regulation or Treasury decision, and such reversal is not immediately occasioned or required by a decision of a court of competent jurisdiction," the subsequent regulation or decision might be applied without retroactive effect. This provision was carried into the Revenue Acts of 1924 and 1926. 43 Stat. 253, 340; 44 Stat. 9, 114. The 1928 Act expanded it to include cases where the new Regulation or Treasury decision was occasioned or required by a court decision. 45 Stat. 791, 874; S. Rep. No. 960, 70th Cong., 1st Sess., p. 40. The Conference Committee stated that: "It is hoped that this provision will prevent the constant reopening of cases on account of changes in regulations or Treasury decisions, and it is believed that sound administration properly places upon the Government the responsibility and burden of interpreting the law and of prescribing regulations upon which the taxpayers may rely." H. R. Rep. No. 1882, 70th Cong., 1st Sess., p. 22.

The Committee Reports state that § 506 of the Revenue Act of 1934, now § 3791 (b) of the Internal Revenue Code, was intended to permit the Treasury to avoid inequities to persons who had closed transactions in reliance upon "existing practice," and that the "amendment extends the right granted by existing law to the Treasury Department to give regulations and Treasury Decisions amending prior regulations or Treasury Decisions prospective effect only, by allowing the Secretary, or the Commissioner with the approval of the Secretary, to

We would be reluctant, in any event, to find that Congress intended to hold the effect of § 115 (f) (1) in abeyance until the Treasury should decide that the time was ripe to challenge *Eisner* v. *Macomber* and carry its challenge to this Court. Such an intention would be a serious departure from the usual policy of Congress to provide the taxpayers and tax-gatherers with a practical basis for the timely settlement of questions of taxation arising each year. At the times of enactment, the problem of delay in obtaining decisions of this Court was a matter of grave concern to those concerned with the administration and furnishing of the revenues.[50]

The Government's assertion that Congress intended to hold the meaning of § 115 (f) (1) in suspense until the termination of years of litigation is in conflict with our recent decision in *Parker* v. *Motor Boat Sales Co.,* 314 U. S. 244. There we were called upon to construe § 3 (a) of the Longshoremen's and Harbor Workers' Act, 44 Stat. 1424, which made compensation payable only if "recovery for the disability or death through workmen's compensation proceedings may not validly be provided by State law." Its statement in such terms was due to this Court's decision in *Southern Pacific Co.* v. *Jensen,* 244 U. S. 205, a much criticized and somewhat impaired, but not over-

---

prescribe the exact extent to which any regulation or Treasury Decision, *whether or not it amends a prior regulation or Treasury Decision,* will be applied without retroactive effect. The amendment furthermore permits internal revenue rulings as well as regulations or Treasury Decisions to be applied without retroactive effect." (Italics supplied.) H. R. Rep. No. 704, 73d Cong., 2d Sess., p. 38; S. Rep. No. 558, 73d Cong., 2d Sess., p. 48.

Thus it appears that this legislation was intended to permit escape from the retroactive effects of administrative action by the Treasury, rather than to increase its power to make retroactive rulings. Cf. 69 Cong. Rec. 7881.

[50] Traynor, Administrative and Judicial Procedure for Federal Income, Estate, and Gift Taxes, 38 Columbia Law Review 1393.

ruled, decision which held federal power exclusive and state compensation laws forbidden in an area of "shadowy limits." The Court, speaking through Mr. Justice Black, said, "An interpretation which would enlarge or contract the effect of the proviso in accordance with whether this Court rejected or reaffirmed the constitutional basis of the *Jensen* and its companion cases cannot be acceptable. The result of such an interpretation would be to subject the scope of protection that Congress wished to provide, to uncertainties that Congress wished to avoid." *Id.* at 248, 250.

The Government urges that we read into the Congressional Act an intent to tax these dividends because of considerations that we do not think are entitled to any weight. It argues that the form of § 115 (f) (1) is attributable to "embarrassment" which would have been incident to a "frontal attack" on *Eisner* v. *Macomber*. There is ample ground to know that the prospect of conflict in opinion with this Court on constitutional questions was not sufficient so to mute the 74th and 75th Congresses.[51] This was as it should be. There is no reason to doubt that this Court may fall into error as may other branches of the Government. Nothing in the history or attitude of this Court should give rise to legislative embarrassment if in the performance of its duty a

---

[51] Thus, the Congress which first enacted § 115 (f) (1) also substantially reënacted provisions of the Municipal Bankruptcy Act held unconstitutional in *Ashton* v. *Cameron County District,* 298 U. S. 513. It did so after Chairman Sumners of the Judiciary Committee, in charge of the bill, frankly stated on the floor of the House that it implied certain proceedings which would be unconstitutional under that decision. He went on to say, however, that it was not only the right but the duty of Congress to present this question once more to the Court, since the decision, if allowed to stand, had certain consequences which he described and deplored. This history was called to the attention of the Court, and the Act was sustained. *United States* v. *Bekins,* 304 U. S. 27, 33.

legislative body feels impelled to enact laws which may require the Court to reëxamine its previous judgments or doctrine.[52] The Court differs, however, from other branches of the Government in its ability to extricate itself from error. It can reconsider a matter only when it is again properly brought before it in a case or controversy; and if the case requires, as a tax case does,[53] a statutory basis for a case, the new case must have sufficient statutory support.

And, if we were to assume Congressional "embarrassment" and take it into consideration, we would also be required to weigh the many other political factors which may have motivated the choice employed in the language of § 115 (f) (1). Those in favor of the bill may have believed that the adoption of existing decisions was the

[52] Thus, *O'Malley* v. *Woodrough*, 307 U. S. 277, overruled *Miles* v. *Graham*, 268 U. S. 501, as to the constitutionality of taxation of salaries of federal judges; *United States* v. *Darby*, 312 U. S. 100, overruled *Hammer* v. *Dagenhart*, 247 U. S. 251, as to Congressional power over labor in manufacture; *West Coast Hotel Co.* v. *Parrish*, 300 U. S. 379, overruled *Adkins* v. *Children's Hospital*, 261 U. S. 525, and *Morehead* v. *Tipaldo*, 298 U. S. 587, as to power to enact minimum wage laws. Compare also *Wright* v. *Vinton Branch*, 300 U. S. 440, with *Louisville Joint Stock Land Bank* v. *Radford*, 295 U. S. 555, as to farmer bankruptcy statutes; *Labor Board* v. *Jones & Laughlin Corp.*, 301 U. S. 1, with *Schechter Corp.* v. *United States*, 295 U. S. 495, as to commerce power; and *United States* v. *Darby, supra*, and *Sunshine Anthracite Coal Co.* v. *Adkins*, 310 U. S. 381, with *Carter* v. *Carter Coal Co.*, 298 U. S. 238, as to commerce power. See also, cases cited by Mr. Justice Brandeis in *Burnet* v. *Coronado Oil & Gas Co.*, 285 U. S. 393, 406–408, notes 1 and 2.

[53] Article I, § 8, cl. 1, of the Constitution provides that "The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States . . ." Article I, § 7, cl. 1, provides that "All Bills for raising Revenue shall originate in the House of Representatives; but the Senate may propose or concur with Amendments as on other Bills."

most that was politically possible; those who opposed it may have thought it desirable as matter of tax policy to defer taxation of the stock dividend until realization.[54] Needless to say, speculation upon such factors has no place in the construction of Acts of Congress.

We are asked to make a retroactive holding that for some seven years past a multitude of transactions have been taxable although there was no source of law from which the most cautious taxpayer could have learned of the liability. If he consulted the decisions of this Court, he learned that no such tax could be imposed; if he read the Delphic language of the Act in connection with existing decisions, it, too, assured him there was no intent to tax; if he followed the Congressional proceedings and debates, his understanding of nontaxability would be confirmed; if he asked the tax collector himself, he was bound by the Regulations of the Treasury to advise that no such liability existed. It would be a pity if taxpayers could not rely on this concurrent assurance from all three branches of the Government. But we are asked to brush all this aside and simply to decree that these transactions are taxable anyway.

---

[54] The considerations which underlay the decisions in *Towne* v. *Eisner* and *Eisner* v. *Macomber* may have had their influence in the judgment of Congress itself. Compare the question put by Senator Bone to Senator Black, set forth *supra*, p. 384. Before the decision in *Eisner* v. *Macomber,* the Supreme Judicial Court of Massachusetts had held that stock dividends could be taxed, *Tax Commissioner* v. *Putnam,* 227 Mass. 522, 116 N. E. 904 (1917); but the Massachusetts legislature had also specifically exempted them from income taxation. Mass. Stat. 1920, c. 352, now G. L. c. 62 § 1 (b). After the decision of *Eisner* v. *Macomber,* the Supreme Court of Wisconsin rejected its reasoning in *State ex rel. Dulaney* v. *Nygaard,* 174 Wis. 597, 183 N. W. 884 (1921), but since 1927 stock dividends have been exempted from income taxation. Wis. Stat. § 71.02. In 1926, the New York legislature adopted a provision retroactive to January 1, 1919, the effective date of the first state income-tax law, exempting all stock dividends. See *People ex rel. Clark* v. *Gilchrist,* 243 N. Y. 173, 153 N. E. 39.

Nor is the effect on taxpayers the only consequence of accepting such a proposal. It would unsettle tax administration and subject the Treasury itself to many demands in ways that we cannot anticipate and provide for. Many have sold dividend stocks and paid the postponed tax at higher rates than if they had been taxed as is now proposed. Many have paid on the sale of the original stock because of allocation of part of the dividend to reduce the cost base thereof. Many corporations have been refused deductions on account of this type of stock dividend in computing their undistributed corporate earnings tax, which would become entitled to them. Overhanging the whole effort to accommodate these past transactions to a new retroactive law would be the statute of limitations barring sometimes the Government and sometimes the taxpayer with capricious effects. To rip out of the past seven years of tax administration a principle of law on which both Government and taxpayers have acted would produce readjustments and litigation so extensive we would contemplate them with anxiety. We have recently held as to another questioned decision of this Court that a long period of accommodations to an older decision sometimes requires us to adhere to an unsatisfactory rule to avoid unfortunate practical results from a change. *Davis* v. *Department of Labor,* 317 U. S. 249. We think this another example of the same principle.

The Government acknowledges the hardship which would be incident to the rule we are now asked to declare, and promises its assistance in obtaining legislative correction. It says that: "We are informed by the Treasury that it has no intention of harassing taxpayers with respect to liability for past years, and that if *Eisner* v. *Macomber* is overruled it intends immediately to recommend to Congress legislation which would relieve taxpayers of any unfair retroactive burden that might result from such overruling. . . ."

Of course, if there were an adequate basis in statute and regulation for the tax in question, it is difficult to understand why its collection should be regarded as "harassing." This assurance that if we will but find that Congress has intended to lay the tax it will be asked to declare that it does not intend it to be collected is hardly reassuring that the decision contended for would be what Congress intended. Since it is acknowledged that legislation would be required to adjust equities that are beyond judicial power and to prevent our decision's being used to harass taxpayers, we may well inquire why the legislation should not precede the judicial decision. Why should we be asked to impose by interpretation a tax which the Treasury intends to ask Congress to lift?

We are unable to find that Congress intended to tax the dividends in question, and without Congressional authority we are powerless to do so. That being the case, we cannot reach the reconsideration of *Eisner* v. *Macomber* on the basis of the present legislation and Regulations.

The decision below is

*Affirmed.*

Mr. Justice Rutledge did not participate in the consideration or decision of this case.

Mr. Justice Douglas, dissenting:

*Eisner* v. *Macomber* dies a slow death. It now has a new reprieve granted under circumstances which compel my dissent.

I.

In 1936, Congress provided that stock dividends were taxable as income when they constituted "income to the shareholder within the meaning of the Sixteenth Amendment to the Constitution." [1]  § 115 (f)(1). That statutory

---

[1] Sec. 115 (a) defines "dividend" as follows: "The term 'dividend' when used in this title . . . means any distribution made by a cor-

provision is now rewritten so as to permit stock dividends to be taxable when they constitute "income to the shareholder within the meaning of the Sixteenth Amendment to the Constitution as construed by *Eisner* v. *Macomber.*" That extraordinary result is reached in the face of the plain language of the Act and in face of clear statements of its purpose made in Committee Reports. The report of the House Ways and Means Committee (H. Rep. No. 2475, 74th Cong., 2d Sess., p. 10) stated that stock dividends were to be taxable when they constituted "income to the shareholder within the meaning of the sixteenth amendment to the Constitution." The report of the Senate Finance Committee (S. Rep. No. 2156, 74th Cong., 2d Sess., p. 18) contained the unequivocal statement that "stock dividends are made taxable *to the full extent permitted by the Constitution.*" That purpose is now thwarted. Reliance is placed on certain statements made by Mr. Vinson who managed the bill on the floor of the House. Yet the most that can be said is that his statements in explanation of the bill were ambiguous. He stated, to be sure, that the new provision was not to be

poration to its shareholders, whether in money or in other property, (1) out of its earnings or profits accumulated after February 28, 1913, or (2) out of the earnings or profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made."

Sec. 115 (f) (1) is entitled "General Rule" and reads as follows: "A distribution made by a corporation to its shareholders in its stock or in rights to acquire its stock shall not be treated as a dividend to the extent that it does not constitute income to the shareholder within the meaning of the Sixteenth Amendment to the Constitution."

Sec. 115 (j) sets forth the formula for valuation of dividends other than cash dividends: "If the whole or any part of a dividend is paid to a shareholder in any medium other than money the property received other than money shall be included in gross income at its fair market value at the time as of which it becomes income to the shareholder."

regarded as "an attack upon the Eisner against Macomber decision." 80 Cong. Rec., Pt. 6, p. 6215. But in answer to an inquiry from Mr. Treadway whether the new provision "describes new stock dividends that can be taxed or what portion of stock dividends under the sixteenth amendment can in the future be taxed," he made the following statement: "Well, we take the broad position that stock dividends that are taxable income within the sixteenth amendment are subject to taxation, and if they are not such stock dividends and not any taxable income under the sixteenth amendment, they are not subject to taxes." *Id.*, p. 6310. I fail to see in that declaration even any intimation that *Eisner* v. *Macomber* rather than the Constitution marked the reach of the new legislation. Furthermore, a reading of the whole discussion on the floor of the House indicates to me that his denial that the legislation made an "attack" on *Eisner* v. *Macomber* fell far short of suggesting that the House intended to *foreclose* this Court from reëxamining *Eisner* v. *Macomber*. If Congress had that purpose, the Act hardly would have been phrased in terms which embrace the full scope of the Sixteenth Amendment. To me, the disavowal of an intent to "attack" *Eisner* v. *Macomber* meant no more than a disclaimer of any purpose to propose unconstitutional legislation. *Eisner* v. *Macomber* is a decision of this Court. Under the traditional conceptions of the place of judicial review in our constitutional system, this Court and only this Court can change the rule of that case in absence of an amendment to the Constitution. Congress here was merely respecting that traditional view. It wanted to go as far as it could. But it could have no idea how far that would be until this Court spoke. No one could predict whether this Court would overrule, modify, or sustain *Eisner* v. *Macomber* when the 1936 legislation came before

it. Indeed, when the 1936 bill passed the House,[2] *Koshland* v. *Helvering*, 298 U. S. 441, which narrowed the application of *Eisner* v. *Macomber*, had not been decided by this Court. And *Helvering* v. *Gowran*, 302 U. S. 238, which somewhat extended the rule of the *Koshland* case was not decided until after the 1936 Act was passed. But numerous decisions by lower courts had made inroads on the *Eisner* v. *Macomber* doctrine. The rule of that case was in flux; a process of erosion had set in; and none knew where that erosion would cease. Accordingly, Congress drafted § 115 (f) of the 1936 Act in the most flexible of terms. It used sweeping language incorporating the full coverage of the Sixteenth Amendment so that those stock dividends would be taxed which this Court would permit to be taxed. There are probably other ways in which the same idea could have been phrased. But the one chosen is clear enough.

The only Treasury Regulations applicable to the taxable year in question—1939—are Regulations 103. These were originally promulgated on January 29, 1940. Sec. 19.115–7 provided: "A distribution made by a corporation to its shareholders in its stock or in rights to acquire its stock shall be treated as a dividend to the full extent that it constitutes income to the shareholders within the meaning of the sixteenth amendment to the Constitution." That sentence was followed by the statement, "The Supreme Court has pointed out some of the characteristics distinguishing a stock dividend which constitutes income from one which does not constitute income within the meaning of the Constitution." Then followed a summary of our decisions, ending with three examples based on the *Koshland* case, *Eisner* v. *Macomber,* and the *Gow-*

---

[2] April 29, 1936. See 80 Cong. Rec., p. 6367. The *Koshland* case was decided by this Court on May 18, 1936.

*ran* case. On November 15, 1940, this regulation was amended by striking out everything following the first sentence. This regulation, however, even in its original form did not and could not foreclose inquiry into the validity of the decision in *Eisner* v. *Macomber*. It did no more than state the constitutional principles on which the decided cases rested. It certainly did not indicate that the Treasury construed the statute more narrowly than the Constitution itself. However that may be, this Court on more than one occasion has refused to follow a Treasury regulation which it felt to be "in the teeth" of the statute. *Helvering* v. *Sabine Transportation Co., ante*, p. 306; *Helvering* v. *Credit Alliance Corp.*, 316 U. S. 107. If this regulation be construed to narrow the Act so as to tax only stock dividends permitted by *Eisner* v. *Macomber*, I would have less reluctance in striking it down than I have had in other instances.

But there is said to be lack of wisdom in this interpretation of the Act. It is argued that it would be disruptive of tax administration. It is urged that a decision which now overruled *Eisner* v. *Macomber* would be unfair because it would be retroactive. Those matters are none of our business. Every revenue act which Congress has passed has a retroactive effect. It is something on which taxpayers of necessity take their chances. *Milliken* v. *United States*, 283 U. S. 15, 23. And many of the uncertainties in revenue acts necessarily are not resolved until this Court passes on them years later. Here there is no possible basis for complaint. These stock dividends were declared in 1939, three years after the Act making them taxable was passed. Of course, the taxpayer no more than Congress could predict what interpretation this Court would give the new statute. Sec. 115 (f) (1), however, made the risks apparent. The fact that some guessed wrong is wholly irrelevant to this litigation. Inequities may result from a holding in 1943 that *Eisner* v.

*Macomber* has not been the law since 1936. But the relief against them lies with Congress. Our task ends if we erase *Eisner* v. *Macomber* and give Congress a clean slate on which to write. Then and only then can Congress design a tax system treating stock dividends consistently. So long as Congress has to guess whether or not this Court will overrule *Eisner* v. *Macomber,* any interim treatment which it gives stock dividends may have to be readjusted after this Court speaks, so as to remove inequities which may have resulted.

## II.

I think *Eisner* v. *Macomber* should be overruled. The Sixteenth Amendment gives Congress the power "to lay and collect taxes on incomes, from whatever source derived." As Mr. Justice Brandeis stated in his dissent in *Eisner* v. *Macomber,* 252 U. S., p. 237, that Amendment was designed to include "everything which by reasonable understanding can fairly be regarded as income." Stock dividends representing profits certainly are income in the popular sense. "From a practical common-sense point of view there is something strange in the idea that a man may indefinitely grow richer without ever being subject to an income tax." Powell, *Income From Corporate Dividends,* 35 Harv. L. Rev. 363, 376. The wealth of stockholders normally increases as a result of the earnings of the corporation in which they hold shares. I see no reason why Congress could not treat that increase in wealth as "income" to them.[3] See *Collector* v. *Hubbard,*

[3] Cf. the income tax of partners. Sec. 182 of the Internal Revenue Code provides: "In computing the net income of each partner, he shall include, whether or not distribution is made to him . . . (c) His distributive share of the ordinary net income or the ordinary net loss of the partnership, computed as provided in section 183 (b)." A partner is chargeable with his allocable share of the partnership earnings even where they could not be distributed to him by reason of

12 Wall. 1, 18; *Helvering* v. *National Grocery Co.,* 304 U. S. 282, 288; Powell, *The Stock-Dividend Decision and The Corporate Nonentity,* 5 Nat. Tax Assoc. Bull. 201. The notion that there can be no "income" to the shareholders in such a case within the meaning of the Sixteenth Amendment unless the gain is "severed from" capital and made available to the recipient for his "separate use, benefit and disposal" (*Eisner* v. *Macomber,* 252 U. S., pp. 207, 211) will not stand analysis. In cases like *Koshland* v. *Helvering* and *Helvering* v. *Gowran* where stock dividends were held to be taxable as income, both the original investment and the accumulations were retained by the company. Yet those cases hold that stockholders may receive "income" from the operations of their corporation though the corporation makes no distribution of assets to them. And see *United States* v. *Phellis,* 257 U. S. 156; *Rockefeller* v. *United States,* 257 U. S. 176; *Cullinan* v. *Walker,* 262 U. S. 134; *Marr* v. *United States,* 268 U. S. 536. Other cases make plain that there may be "income" though neither money nor property has been received by the taxpayer. Benefits accruing as the result of the discharge

local law. *Heiner* v. *Mellon,* 304 U. S. 271, 281: "The tax is thus imposed upon the partner's proportionate share of the net income of the partnership, and the fact that it may not be currently distributable, whether by agreement of the parties or by operation of law, is not material." As stated by Mr. Justice Brandeis in his dissent in *Eisner* v. *Macomber,* 252 U. S., p. 231: "The stockholder's interest in the property of the corporation differs, not fundamentally but in form only, from the interest of a partner in the property of the firm. There is much authority for the proposition that, under our law, a partnership or joint stock company is just as distinct and palpable an entity in the idea of the law, as distinguished from the individuals composing it, as is a corporation. No reason appears why Congress, in legislating under a grant of power so comprehensive as that authorizing the levy of an income tax, should be limited by the particular view of the relation of the stockholder to the corporation and its property which may, in the absence of legislation, have been taken by this court."

of the taxpayer's indebtedness or obligations constitute familiar examples. *Old Colony Trust Co.* v. *Commissioner,* 279 U. S. 716; *Douglas* v. *Willcuts,* 296 U. S. 1; *United States* v. *Hendler,* 303 U. S. 564. And increases in the value of property as a result of improvements made by the lessee are taxable income to the lessor even though the taxpayer could not "sever the improvement begetting the gain from his original capital." *Helvering* v. *Bruun,* 309 U. S. 461, 469. The declaration of a stock dividend normally will not increase the wealth of the stockholders. Its accrual will usually antedate that event. See Haig et al., The Federal Income Tax (1921) p. 8. For it is the accumulation of corporate earnings over a period of time which marks any real accrual of wealth to the stockholders. The narrow question here is whether Congress has the power to make the receipt of a stock dividend based on earnings an occasion for recognizing that accrual of wealth for income tax purposes. Congress has done so through the formula of computing the "income" to the stockholders at the "fair market value" of the stock dividends received. § 115 (j). Whether that is the most appropriate procedure which could be selected for the purpose may be arguable. But I can see no constitutional reason for saying that Congress cannot make that choice if it so desires. That is one way—though perhaps at times a crude one—of measuring for income tax purposes the wealth which normally accrues to stockholders as a result of the earning of their corporation.

Mr. Justice Black and Mr. Justice Murphy join in this dissent.