# THOMAS H. BRODHEAD *v.* WILLIAM BORTHWICK, TAX COMMISSIONER OF THE TERRITORY OF HAWAII.

## Nos. 2581 and 2583.

Argued November 19, 20, 1945.  Decided March 4, 1946.

KEMP, C. J., PETERS AND LE BARON, JJ.

OPINION OF THE COURT BY PETERS, J.
(Le Baron, J., concurring in part and dissenting in part.)

The opinion of Mr. Justice LeBaron renders a statement of the case and of the errors relied upon unnecessary. It will suffice to state our conclusions.

As we view the case, the extension by section 55 of the Organic Act of the legislative power of the Territory to all rightful subjects of legislation not inconsistent with the Constitution and laws of the United States, locally applicable, includes the power to lay, consistently with the restrictions and limitations imposed by the Constitution and laws of the United States, an annual excise tax upon all businesses and activities carried on in the Territory measured by the application of rates against values, gross proceeds of sales or gross income, as the case might be.[1] A tax imposed by a nonfederal political agency, however reasonable, universal and nondiscriminating, the legal effect of which is to lay a direct and immediate tax upon the instrumentalities of the United States, is within the implied prohibition of the Constitution of the United States against laying a burden upon or interfering with federal activities,[2] even though imposed under the guise of an excise tax.[3] A nondiscriminating territorial excise tax measured by the application of rates against values,

[1] W. C. Peacock & Co. v. Pratt, 121 Fed. 772, 776; Haavik v. Alaska Packers Assn., 263 U. S. 510, 513; Kitagawa v. Shipman, 54 F. (2d) 313, 318; Yerian v. Territory of Hawaii, 130 F. (2d) 786, 788; Robertson v. Pratt, 13 Haw. 590.

[2] Johnson v. Maryland, 254 U. S. 51, 55; Mayo v. United States, 319 U. S. 441.

[3] Choctaw & Gulf R. R. v. Harrison, 235 U. S. 292; Northwestern Ins. Co. v. Wisconsin, 275 U. S. 136; Panhandle Oil Co. v. Knox, 277 U. S. 218; Macallen Co. v. Massachusetts, 279 U. S. 620.

gross proceeds of sales or gross income, as the case may be, is not within the constitutional prohibition merely because in its incidence it might indirectly reach a federal instrumentality.[4] It was the intention of the legislature, as manifested by sections 2, 24 and 3 of the general excise tax law of 1935, that in the computation of the tax there be excepted from gross proceeds of sales or gross income only so much of the gross proceeds of sales or gross income derived from the sales made to the United States Government, its departments or agencies, which was then or might thereafter be exempted from taxation under the Constitution of the United States or the Organic Act of the Territory, such exception, however, not to apply if and when the Congress of the United States permitted the Territory to impose a privilege tax upon gross proceeds of sales made to the United States Government, its departments or agencies. And although in its incidence the local general excise tax law of 1935[5] indirectly affects the United States Government and its departments or agencies, its economic effect is consequential and remote and not immediate and direct.[6]

Whether or not the effect of the decision in the case of *Panhandle Oil Co.* v. *Knox* was to extend constitutional immunity from taxation under the local excise law to the gross proceeds of sales to federal instrumentalities is deemed of no importance further than it may serve to ascertain the legislative intent in the use of the language

---

[4] Society for Savings v. Coite, 6 Wall. 594 (1867); Home Ins. Co. v. New York, 134 U. S. 594 (1889); Provident Institution v. Massachusetts, 6 Wall. 611 (1867); Hamilton Company v. Massachusetts, 6 Wall. 632 (1867); Metcalf & Eddy v. Mitchell, 269 U. S. 514 (1925); Fidelity & Deposit Co. v. Pennsylvania, 240 U. S. 319 (1915); Trinityfarm Co. v. Grosjean, 291 U. S. 466 ,(1933); James v. Dravo Contracting Co., 302 U. S. 134 (1937); Alabama v. King & Boozer, 314 U. S. 1 (1941); Curry v. United States, 314 U. S. 14 (1941).

[5] Sess. Laws 1935, Act 141.

[6] Alabama v. King & Boozer, supra. See also dissenting opinion of

contained in section 3 of the Act. Nor whether the *King & Boozer* case overruled the *Panhandle Oil Co.* case. The tax, the legality of which is in question herein, was assessed for the year 1942. The *King & Boozer* case was decided in November, 1941. And the rationale of the *King & Boozer* case applies[7] without the necessity of further legislation on the subject.[8] Nor are we concerned with the question of whether the legislature was correct in assuming, as indicated by the proviso of section 3, that the Congress of the United States is authorized to permit the Territory to impose a privilege tax upon gross proceeds or gross income derived from sales made to the United States Government, its departments or agencies or that it was legally necessary to do so. An intent clearly and unequivocally expressed is no less so because it may be based upon a false hypothesis.

The only troublesome question involved is whether the rate to be applied to gross proceeds of sales or gross income, as the case might be, should be one and one-half per cent, the rate applicable to "every person engaging or continuing * * * in the business of selling any tangible personal property whatsoever (not including, however, bonds or other evidence of indebtedness or stocks)" or the rate of one quarter of one per cent, the rate applicable "in the case of a wholesaler or producer."

Section 2, B (1) of the Act imposes a tax "Upon every person engaging or continuing within this Territory in the business of selling any tangible personal property whatsoever (not including, however, bonds or other evi-

---

Mr. Justice Holmes in Panhandle Oil Co. v. Knox, supra, dissenting opinion of Mr. Justice Stone in Macallen Co. v. Massachusetts, supra; Trinityfarm Co. v. Grosjean, supra.

[7] Philadelphia v. Schaller, 148 Pa. Super. Ct. 276, 25 A. (2d) 406, *cert. denied* 317 U. S. 649.

[8] Western L. Co. v. State Bd. of Equalization, 11 Cal. (2d) 156, 78 P. (2d) 731.

dence of indebtedness or stocks)" of one and one quarter per cent (since increased to one and one-half per cent) of the gross proceeds of sales of the business, except in the case of wholesalers or producers, in which case it is one quarter of one per cent. Section 1, paragraph (8) defines "gross proceeds of sale" as the "value actually proceeding from the sale of tangible personal property without any deduction on account of the cost of property sold or expenses of any kind." Section 1, paragraph (10) defines a wholesaler as "a person doing a regularly organized wholesale or jobbing business, known to the trade as such, and only with respect to the following sales: (a) sales, to a licensed retail merchant or jobber, for purposes of resale; (b) sales, to a licensed manufacturer, of material or commodities which are to be incorporated by such manufacturer into a finished or saleable product (including the container or package in which the product is contained) during the course of its preservation, manufacture or processing, including preparation for market, and which will remain in such finished or saleable product in such form as to be perceptible to the senses, which finished or saleable product is to be sold and not otherwise used by such manufacturer; or (c) sales, to a licensed contractor, of material or commodities which are to be incorporated by such contractor into the finished work or project required by the contract and which will remain in such finished work or project in such form as to be perceptible to the senses." It is apparent from the foregoing references to the Act that the legislature intended that the rate of tax applicable to the gross proceeds of all sales of tangible personal property should be one and one-quarter per cent or such rate to which the same might be decreased or increased under the provisions of section 2, III, except in the cases of sales made by a wholesaler as defined and in respect to the types of sales enumerated

and defined in section 1, paragraph (10) (a), (b) or (c), and except in case of sales made by a producer, when the rate should be one quarter of one per cent. Whether or not, after excluding wholesalers or producers from the all-inclusive phrase "upon every person," retailers alone remain is a question that is not involved. The Act, besides carrying its own definition of a "wholesaler" and the sales to which the term shall apply, thus restricting and limiting the ordinarily accepted meaning of the term "wholesaler," also carries a definition of the term "retailer" [§ 1, par. (13)] and of the term "producer" [§ 1, par. (11)]. Unquestionably, the phrase "upon every person" includes retailers, and this conclusion is confirmed by the running head of section 1, B, and the administrative regulations in respect to retailers contained in section 2, 1-B (1), (3), (4) and (5).

It is conceded that the tax in question involves sales of tangible personal property, not including bonds or other evidence of indebtedness or stocks. Hence, the gross proceeds of sales made by the taxpayer of tangible personal property was subject to a tax of one and one-quarter per cent unless, as claimed by him, they were made by him as a wholesaler and come within any of the categories of sales defined in section 1, paragraph (10) (a), (b) or (c). The taxpayer claims that the sales made to post exchanges and ships' service stores come within section 1, paragraph (10) (a). It is admitted by the Territory that the taxpayer does a regularly organized wholesale business, known to the trade as such, and that the sales involved were for the purpose of resale. But are post exchanges and ships' service stores "licensed merchants," as that term is used in section 1, paragraph (10) (a)? We think not. Post exchanges and ships' stores are admittedly federal instrumentalities. While post exchanges and ships' stores sell at "retail" and the sales in question were

made for purposes of resale, neither post exchanges nor ships' stores are "licensed," as that term is used in section 1, (10) (a). By section 21 of the Act all persons having gross proceeds of sales upon which a privilege tax is imposed by the Act are required, as a condition precedent to engaging or continuing such business, to secure an annual license upon conditions that are immaterial to our discussion. It is therein further provided that: "Any person who may lawfully be required by the Territory, and who is required by this Act, to secure a license as a condition precedent to engaging or continuing in any business subject to taxation under this Act, who shall engage or continue in such business without securing such license in conformity with this Act, shall be guilty of a misdemeanor * * *." A privilege tax is not imposed by the Act upon the gross proceeds of sales by federal instrumentalities. While not expressly exempted, they are, as heretofore pointed out, immune from such taxation by the Territory. Hence, one of the essential attributes of a "licensed merchant" is absent and the legal effect is to exclude such sales from the category of sales defined in section 1, paragraph (10) (a). In other words, in respect to sales to federal instrumentalities, the taxpayer was not a wholesaler as defined in the Act.

In our opinion the word "licensed" included in the definition of sales in section 1, paragraph (10) (a), was used by the legislature advisedly. It must be assumed that it was advised of the immunity from taxation of federal instrumentalities. It extended exemptions by the Act itself to certain business activities exercising retail functions, *viz.*, hospitals, infirmaries and sanatoria. It no doubt had in mind other business activities which, though retailers in a popular sense, nevertheless legally were not retailers under the terms of the Act. In each of the instances referred to no license is required under the pro-

visions of section 21 of the Act. From all this it is abundantly clear that by the use of the word "licensed" the legislature intended to exclude from the definition of "wholesaler" sales made to persons exercising retail functions who under the provisions of the Act were not required to be licensed.

Nor are we satisfied that post exchanges and ships' service stores are "merchants" in the sense that the term "merchant" is employed in section 1, paragraph (10) (a). The Act itself does not define the word "merchant." Hence, its common-law meaning controls. A merchant has been defined as one who is engaged in buying and selling goods, wares or merchandise for gain or profit.[9] The army regulations governing post exchanges are in evidence. It was stipulated that ships' service stores have the same relation to the United States Navy as post exchanges have to the United States Army. The regulations governing post exchanges are epitomized in the opinion of the court in the case of *Standard Oil Co.* v. *Johnson*, 316 U. S. 481, at 484. It was there held: "* * * post exchanges as now operated are arms of the Government deemed by it essential for the performance of governmental functions. They are integral parts of the War Department, share in fulfilling the duties entrusted to it." If post exchanges and ships' service stores as now operated are arms of the Government and integral parts of the respective services to which they are attached, their functions are governmental and not proprietary,[10] and in whomever the title to the tangible personal property sold may be vested immediately prior to sale, such person is not a "merchant" within the meaning of section 1, paragraph (10) (a) of

---

[9] Bacon v. Cannady, 144 Ga. 293, 86 S. E. 1083; In re Jupp, 274 Fed. 494; Rosenbaum v. City of Newbern, 118 N. C. 83, 24 S. E. 1; H. H. Kohlsaat & Co. v. O'Connell, 255 Ill. 271, 99 N. E. 689.

[10] Fed. Land Bank v. Bismark Co., 314 U. S. 95, 102.

322

the Act. For this additional reason the taxpayer was not a wholesaler as defined in the Act.

Nor does the imposition of the higher rate of taxation applicable to "every person" juridicially discriminate against sales to federal instrumentalities.

The term "retailer" is defined in the Act as "any person who sells, other than as a wholesaler within the definition of this Act, tangible personal property for consumption or use by the purchaser and not for resale." The statutory definition of the word "wholesaler" has already been quoted. If, as heretofore held, the taxpayer is not a "wholesaler" as defined by the Act and is included in the all-inclusive term of "every person" employed in section 2, B, which levies the tax, he is simply one of a class to which the rate imposed uniformly applies. "Every person" selling to federal instrumentalities pays the same tax. All vendors of the same class are treated alike. Moreover, by the same token, sales to retailers are divided into two classes, *viz.*, (1) sales to a retailer either not licensed or not a merchant, when the vendor falls into the category of "every person" and the higher rate applies, and (2) sales "to a licensed retail merchant for purposes of resale" when the vendor falls into the excepted class of "wholesaler" and the lower rate applies. In either case all vendors in the respective classes to which they belong are treated uniformly and pay the same applicable tax.

The exception of "wholesalers" as a class from "every person" as a class affects a natural and reasonable classification of vendors especially where, as here, it synchronizes with the evident intent of the legislature, speaking generally, that sales of tangible personal property in their normal distribution through commercial channels bear two taxes, *viz.*, one when sold at wholesale when the rate is one quarter of one per cent and one when sold at retail when the rate is one and one-half per cent. The same may

be said of the classification of sales to retailers where resales by the retailers are nontaxable by reason of immunity, exemption or otherwise. They are readily distinguishable from sales to a "licensed retail merchant." And the legislature apparently intended that as to each class a different rate of taxation obtain, in the former the rate of one and one-half per cent as sales made by "every person" and in the latter one-quarter per cent as sales made by a "wholesaler." The well-settled rule that the legislature may classify objects for the purposes of taxation has long since received recognition and been applied by this court.[11] Diversity of rate of taxation based upon proper classification of the objects of taxation is not discrimination. It would serve no useful purpose to pedantically repeat what this court has heretofore said on the subject. The language of the court in the *Robertson* case and the authorities there cited are equally applicable here.

Moreover, factually no discrimination exists against sales to post exchanges or ships' service stores. If anything, it is the other way about. And of this plaintiff does not complain.

It has been tritely said that the ultimate consumer always pays the tax. Here it is a question of the absorption of the tax by the retailer. The post exchanges and ships' service stores, however, by reason of their immunity, absorb less in taxes under the general excise tax law of 1935 than licensed retail merchants. In the former case the tax to be absorbed is only one and one-half per cent, in the latter one and three-fourths per cent. The result is that the purchasers to whom sales at post exchanges and ships' service stores are restricted as ultimate consumers pay less than the general public purchasing from licensed retail merchants.

---

[11] Naone v. Thurston, 1 Haw. 392; Campbell v. Shaw, 11 Haw. 112; Robertson v. Pratt, supra.

The judgment appealed from is reversed and the cause remanded for a new trial.

*R. V. Lewis*, Assistant Attorney General (also on the briefs) for Tax Commissioner, defendant-plaintiff in error.

*M. Cades* (*Smith, Wild, Beebe & Cades* on the brief) for plaintiff-defendant in error.

OPINION OF LE BARON, J.
(Concurring in part and dissenting in part.)

The defendant in error, hereinafter referred to as the taxpayer, under protest paid two privilege taxes to the Territory of Hawaii, pursuant to the "General Excise Tax Law" popularly known as the "Gross Income Tax Act." (Act 141, S. L. 1935, as amended, now §§ 5441-5482, R. L. H. 1945.)  One tax was levied and collected by the plaintiff in error, hereinafter referred to as the tax commissioner, upon the taxpayer's gross proceeds of or gross income derived from sales, made for the use and consumption of various federal departments, to the United States and the other was likewise levied and collected upon those of or derived from sales, made for purposes of resale, to post exchanges of the Army and ships' services of the Navy of the United States.  For convenience both sets of sales are referred to collectively as "federal sales" and the taxes with respect to them as the "tax," except as the context hereof may otherwise require.  They were made and collected respectively for a period beginning July 1, 1942, and ending March 31, 1944.

The taxpayer brought appropriate action to recover the tax.  After trial, jury waived, the trial judge found no legislative intent in the Act to impose taxation upon gross proceeds of or gross income derived from federal sales and rendered judgments accordingly for full recovery of the tax paid.  From these judgments the tax com-

missioner sued out writs of error which have been consolidated for hearing and argument before this court.

Four main questions are posited on appeal. Did the legislature intend to impose taxation upon gross proceeds of or gross income derived from federal sales? If it did, is its imposition valid? If the imposition is valid, then is the rate at which the tax was assessed relative to sales, made for the purposes of resale, to post exchanges and ships' services authorized by the legislature, the taxpayer not protesting the rate assessed relative to sales, made for use and consumption, to the United States? If authorized, is that assessment valid?

In section 2, subsection 1, of the Act, the legislature imposes privilege taxes upon "the persons on account of their business and other activities in this Territory," thereby plainly identifying the persons taxable under the Act and clearly explaining why they are taxable without any limitation whatsoever respecting the character of persons with whom they may deal or the nature of the business of such other persons. This imposition of tax embraces "every person engaging or continuing within this Territory in * * * business" or other activity as designated and set forth by the paragraphs immediately thereunder. The legislative intent therein manifested is consonant with the general purpose of the Act to exercise the legislative tax power of the Territory to the full extent permitted by the Organic Act of the Territory and the Constitution of the United States, such purpose being indicated by its general severability clause and special provision directed against any unconstitutional taxation upon gross proceeds of sales derived from sales made to the United States, its departments or agencies. (§§ 24 and 3, *supra.*) In the general severability clause the legislature contemplates the possibility that some portions of the Act after its

enactment would be declared invalid and provides against the impairing of the remaining portions by reason of such a declaration, expressly stating that "If the application of any provision of this Act to any person or circumstances is held invalid, the application of such provision to other persons or circumstances shall not be affected thereby." (§ 24, *supra.*) In the specific provision relative to unconstitutional taxation, the legislature, pertinent to the case of the taxpayer, provides that: "In computing the amounts of any tax imposed under this Act, there shall be excepted from the gross proceeds of sales * * * so much thereof as * * * is derived from any sales made to the United States government, its departments or agencies, which is, or may hereafter be, exempted * * * under the Constitution of the United States or the Organic Act of the Territory * * * ." (§ 3, *supra.*) Post exchanges and ships' services of the Army and Navy undisputedly come within the term "its departments or agencies" and sales to them as well as to the United States likewise come within the term "federal sales" as used in this opinion. (See *Standard Oil Co.* v. *Johnson,* 316 U. S. 481, 86 L. ed. 1161.) While such specific exclusion may not have been necessary in view of the comprehensive nature of the severability clause, it manifests a caution by the legislature which in no way detracts from the force of the plain, certain and unambiguous language employed. A bare reading of it as well as of the Act as a whole suffices to demonstrate that all gross proceeds of sales capable of being taxed by the Territory under the Constitution or Organic Act are clearly within the scope of taxation intended by the legislature.

Consequently, the first basic issue to be determined relative to whether gross proceeds of federal sales are within the scope of the Act is whether they at the time of

receipt and levy were in fact precluded therefrom by the Constitution of the United States by reason of an exemption from taxation therein, the parties being agreed that the meaning of the Constitution in respect to such an exemption must be found in the decisions of the Supreme Court of the United States.

In considering such decisions, it is evident that the Supreme Court of the United States had adopted, prior to the Act's effective date of July 1, 1935, a construction of the Federal Constitution exempting federal sales from any taxation by a State without regard to whether the tax is discriminatory or nondiscriminatory. (*Panhandle Oil Co.* v. *Knox*, 277 U. S. 218, 72 L. ed. 857; see *Indian Motorcycle Co.* v. *United States*, 283 U. S. 570, 75 L. ed. 1277; *Graves* v. *Texas Company*, 298 U. S. 393, 80 L. ed. 1236.) On the other hand, it is equally evident that the Supreme Court of the United States in 1937 began to whittle away the efficacy of such construction with respect to nondiscriminatory taxation until finally in 1941 that Court held that the holding of the *Panhandle Oil Co.* case and its line of cases invalidating a nondiscriminatory tax on federal sales was no longer tenable and upheld the validity of such a tax. (*James* v. *Dravo Contracting Co.*, 302 U. S. 134, 82 L. ed. 155; *Alabama* v. *King & Boozer*, 314 U. S. 1, 86 L. ed. 3; *Curry* v. *United States*, 314 U. S. 14, 86 L. ed. 9; *Penn Dairies* v. *Milk Control Comm'n.*, 318 U. S. 261, 87 L. ed. 748.) The effect of these decisions is that from the time of the enactment of Act 141 the meaning of the Constitution as construed by the Supreme Court of the United States underwent a complete change with respect to nondiscriminatory taxation of federal sales by a State being exempt so that after 1941 they were held to be rightful subjects of state nondiscriminatory taxation and no longer exempt therefrom under the Constitution. This later construction has not since been overruled. It is therefore

controlling as well as decisive of the first basic issue provided that what are rightful subjects of nondiscriminatory taxation for States are also ones for the Territory. Notwithstanding the sovereignty of political independence and possession of original and underived powers existing in a State and the lack thereof in the Territory, there is no substantial difference between the nature and extent of a State's legislative power and those of the Territory when not curtailed by Congress, it having given full authority to the legislature of the Territory by the Organic Act in section 55 thereof to legislate upon "all rightful subjects of legislation not inconsistent with the Constitution and laws of the United States locally applicable" and having thereby vested in the legislature the full taxing power which had theretofore existed in Congress over the Territory of Hawaii. (See *Assessor v. Com. Cable Co.*, 16 Haw. 396; *Haavik v. Alaska Packers Assn.*, 363 U. S. 510, 68 L. ed. 414; *Kitagawa v. Shipman*, 54 F. [2d] 313, *aff'g* 31 Haw. 726; *Yerian v. Territory of Hawaii*, 130 F. [2d] 786, *aff'g* 35 Haw. 855; *Gromer v. Standard Dredging Co.*, 224 U. S. 362, 56 L. ed. 801.) It follows therefrom that what are rightful subjects of nondiscriminatory taxation for States under the Constitution are also ones for the Territory in the absence of laws of the United States to the contrary or exempted from taxation under the Organic Act of the Territory. Whether this latter limitation exists presents the second basic issue, closely integrated to the first.

Any exemption of such rightful subjects of legislation, as are the taxpayer's gross proceeds of federal sales, from nondiscriminatory taxation by the Territory under the Organic Act would be purely objective, the test being whether the extending to them of the legislative power of the Territory is "inconsistent with the Constitution and laws of the United States locally applicable." (Organic

Act § 55.) As no such inconsistency has ever existed with respect to the laws of the United States and none with respect to the Constitution after 1941, the taxpayer's gross proceeds of federal sales are not so exempt under the Organic Act. Neither being exempt under the Constitution, they therefore fall within the scope of taxation intended by the legislature and its imposition of tax upon them, aside from the rate at which assessed, is a valid exercise of "the legislative power of the Territory," the specific cautionary provision of section 3 relative to their mandatory exclusion in computing the tax being inapplicable, as likewise is the general severability clause of section 24.

The taxpayer, nevertheless, contends that the legislature intended by the considered provision of section 3, *supra,* to incorporate into the Act the legal effect of the Constitution, as construed by the *Panhandle Oil Co.* case, for the purpose of limiting the Act's scope independently of any change in the meaning of the Constitution which subsequently may be attributed to it by the Supreme Court of the United States. The difficulty, however, is that the legislature expressed no such intent. The taxpayer premises his contention upon the authority of *Helvering* v. *Griffiths,* 318 U. S. 371, 87 L. ed. 843, and *Parker* v. *Motor Boat Sales,* 314 U. S. 244, 86 L. ed. 184. Such authority has no application to Act 141. The cases of *Helvering* and *Parker* before the Supreme Court of the United States turn upon an unequivocal legislative history of the statutes under consideration, the history recognizing the controlling effect of one of that Court's prior cases which had not been reversed or abrogated at the time the subject of the tax was received by the taxpayer on one hand or at the time of death of an employee on the other. In the instant case there is no such legislative history of Act 141 and at the time of its enactment the case of the Supreme Court

of the United States, construing the Constitution as effecting an exemption from nondiscriminatory state taxation then in force, was no longer in force when the subjects of taxation were received and the protested tax levied. Furthermore, in the *Helvering* case the Supreme Court of the United States was urged to reverse its prior decision, which it declined to do because it could not find that Congress intended to tax the subject in question, whereas no such request was or could be made of this court, which is confronted with an existing construction of the Constitution by the Supreme Court of the United States in abrogation of its prior construction as a *fait accompli* and does find from the language of the Act itself that the legislature clearly intended to impose and authorize a tax upon the subjects in question. Again in the *Parker* case the Supreme Court of the United States refused to read a portion of the statute under consideration in a manner that would "defeat" its purpose, whereas this court reads a portion of the Act under consideration according to the ordinary and plain meaning of its language in a manner that effectuates its purpose as well as that of the Act as a whole.

In further support of his contention, the taxpayer argues that the proviso immediately following the considered provision of section 3, *supra*, is indicative of an intention that when once an exemption from taxation under the Constitution has been construed by the Supreme Court of the United States to have existed at the time Act 141 became effective, the exception of gross proceeds of federal sales in computing the amounts of the tax imposed by the Act becomes absolute, subject to enlargement by further exemptions thereunder until such time as the Territory is permitted by Congress to tax gross proceeds derived from federal sales. To such argument I cannot accede. The pertinent part of the proviso reads: "provided, however, that if and when the Congress of the

United States shall permit the Territory of Hawaii to impose a privilege tax upon gross proceeds of sales * * * derived from * * * sales made to the United States government, its departments or agencies, in * * * such event the exception[s] and exemption[s] by this section provided, shall not apply." The language of this proviso does not conflict with that of the preceding provision nor alter its meaning. Hence the broad scope of taxation intended by the legislature is unaffected thereby. Furthermore, the proviso itself has no operative force in this case in that the legislature did not intend to make an exception of any gross proceeds of sales that are capable of being taxed by the Territory under the Constitution or Organic Act, the existence of an exemption thereunder being the condition precedent for the applicability of the exception and congressional permission the condition subsequent for the inapplicability thereof. Without more the contention of the taxpayer is untenable, he having failed to sustain his burden of establishing that his gross proceeds of federal sales come within the exception stated by the Act. (See *Re Excise Tax Rob't Hind, Ltd.*, 34 Haw. 40.)

A nondiscriminatory tax on gross proceeds of federal sales made both for use and consumption and for purposes of resale being within the Act's scope of taxation, the next question for consideration is whether the rate assessed by the tax commissioner against the taxpayer's gross proceeds or gross income derived from sales of tangible personal property, made for purposes of resale, to post exchanges and ships' services of the United States Army and Navy, respectively, is authorized by the legislature. For convenience, these sales are referred to as "post exchange sales" and post exchanges and ships' services as "post exchanges." The taxpayer in making such sales classified himself as a wholesaler and his business of selling to post exchanges as that of a wholesaler for the purpose of paying

a tax assessment in respect thereto at the rate of one quarter of one per cent. The tax commissioner reclassified the taxpayer and his business to the class and category of a retailer for the purpose of assessing the rate of one and one half of one per cent. The taxpayer protests this action of the tax commissioner and challenges his authority under the Act so to do, asserting that the lower rate is the applicable one authorized by the legislature.

Recognizing that a substantial property right of the taxpayer is here involved, I neither presume that the taxpayer is attempting to avoid his duty to the Territory to pay the full amount of the tax imposed against him or that the tax commissioner is attempting to exact unjustly a greater amount of tax than authorized. I do not presuppose in favor of either, but will apply the usual test of statutory construction to declare what the legislature means by the language it has used.

The legislature in section 2, subsection 1, of the Act not only imposes privilege taxes upon "the persons on account of their business and other activities in this Territory" but also provides for the assessment and collection of those taxes. It accomplishes this by the application of percentage rates against "values, gross proceeds of sales or gross income, as the case may be" as the measure of the tax imposed. These rates are specified in paragraphs A to and including H of section 2, subsection 1, immediately following the imposition of taxation. As indicated by their running heads, these paragraphs designate the various businesses and activities with respect to which the specified rates are made applicable. The running heads are: A. Tax on manufacturers; B. Tax on retailers, wholesalers and producers; C. Tax upon contractors; D. Tax upon theaters, amusements, radio broadcasting stations, etc.; E. Tax upon printers and publishers (deleted by L. 1939, c. 252, subsec. 1); F. Tax on service

business; G. Professions, and H. Tax on other business. Such are a brief of the designated businesses and activities to which rates specified by each paragraph are made applicable in measuring the tax imposed. The legislature, however, in section 4 of the Act, expressly exempts certain persons therefrom, the section having no application to the taxpayer.

The tax commissioner justifies his reclassification of the taxpayer and his selling to post exchanges to the class and category of a retailer upon section 2, subsection 1, paragraph B (1) of the Act and rests thereon his authority to assess the higher rate. This paragraph reads: "Tax on retailers, wholesalers and producers. Upon every person engaging or continuing within this Territory in the business of selling any tangible personal property whatsoever (not including, however, bonds or other evidence of indebtedness or stocks) there is likewise hereby levied and shall be assessed and collected a tax equivalent to one and one-quarter (1¼) per cent of the gross proceeds of sales of the business; provided, however, that in the case of a wholesaler or producer the tax shall be equal to one quarter (¼) of one per cent of the gross proceeds of sales of the business." The higher rate so specified is also specified in paragraph H of the same subsection and wherever provided in the Act has been duly increased to one and one-half (1½) per cent pursuant to section 2, subsection III of the Act, as amended by Act 128 of Session Laws 1937. The percentage rate of one and one half will therefore be considered as constituting the higher rate for the purposes of this opinion.

It is evident from the Act as a whole, including the running head "Tax on retailers * * *" of paragraph B in part (1) thereof and references to "the tax on retailers" and "any person engaging or continuing in business as a retailer" of parts (2) and (3) thereof, that the "every

person" referred to in part (1) of paragraph B means those "engaging and continuing within the Territory in the business of selling" as a retailer and the tax assessed accordingly at the higher rate to be the tax on retailers.

The cases of a retailer and wholesaler (that of a producer concededly having no applicability) as dealt with by the legislature are stated by the definitions of the Act. Pertinent to the case of the taxpayer, they read: "When used in this Act, unless otherwise required by the context * * * 'Retailer' shall mean any person who sells, other than as a wholesaler within the definition of this Act, tangible personal property for consumption or use by the purchaser and not for resale. * * * 'Wholesaler' * * * shall apply only to a person doing a regularly organized wholesale * * * business, known to the trade as such, and only with respect to * * * sales, to a licensed retail merchant or jobber for the purposes of resale * * * ." (Section 1, (13) and (10), respectively, *supra.*

The undisputed evidence establishes that the taxpayer in selling the tangible personal property to post exchanges was doing a regularly organized wholesale business, known to the trade as such, and that his sales were for purposes of resale; that such sales were not for consumption or use by the purchaser as the words "consumption" and "use" are restricted by the phrase "and not for resale" in the statutory definition of a retailer. However, such evidence also shows that the purchasing post exchanges, operating exclusively under Army Regulations of the War Department, were not licensed under the Act nor required to be; that they conducted no business subject to taxation under the Act; were not wholesalers, jobbers or consumers but, as instrumentalities of the United States and arms of the War Department, they in the performance of governmental rather than proprietary functions maintained retail stores, bought for the purpose of resale and resold at

the lowest possible prices to the armed forces and civilian employees of the Federal Government on army posts and naval stations for the consumption or use by such purchasers, for their convenience and for additional benefits to the armed forces not otherwise provided by the Government. (See Army Regulations No. 210-65 of the War Department; *Standard Oil Co.* v. *Johnson, supra; Fed. Land Bank* v. *Bismarck Co.,* 314 U. S. 95, 86 L. ed. 65.)

The above facts conclusively show that the case of the taxpayer in selling tangible personal property to post exchanges did not fulfill a definitive requirement of the statutory case of a retailer in that he clearly did not sell "for consumption or use by the purchaser and not for resale." They require, however, a consideration of whether the case of the taxpayer is that of a wholesaler within the meaning of the Act.

In determining whether the taxpayer's case is that of a wholesaler under the Act the phrase "to a licensed retail merchant or jobber" must be construed, the case of the taxpayer clearly fulfilling the other requirements relative to the nature of a wholesaler's business and the purposes of sales thereof. The alternative requirement of a "jobber" with respect to the purchaser need not be considered, post exchanges admittedly not being jobbers and the case of the taxpayer in selling to them therefore standing or falling as a case of a wholesaler upon the purchasing post exchanges meeting or failing to meet the other alternative of "a licensed retail merchant." The noun "merchant" is not defined by the Act and hence its plain, ordinary and commonly accepted meaning must be taken to be the one intended. That meaning is that a merchant is "One who carries on a retail business; a storekeeper or shopkeeper." (Webster's International Dictionary, 2d ed.) This meaning is amplified by the Act's definitions of the words "retail" and "business." (§ 1, [7] and [12], respectively,

*supra.*) So amplified the meaning of the noun "merchant" is one who carries on retail "activities * * * engaged in or caused to be engaged in with the object of gain or economic benefit either direct or indirect" (§ 1, [7], *supra,*) in the selling of "tangible personal property, other than by a wholesaler as such within the definition of the Act, for consumption or use by the purchaser and not for resale." (§ 1, [12], *supra.*) The intended meaning of the noun "merchant" modified by the adjective "retail" is thus but a paraphrase of the noun "retailer" as defined by the Act (§ 1, [13], *supra,*) and hence serves to identify the purchaser as a retailer in contradistinction to a wholesaler, jobber, or consumer. It primarily serves, however, to prevent the lower rate from being applicable to the case of a wholesaler selling to a consumer. In applying this meaning to the facts concerning the purchasing post exchanges, they admittedly not being wholesalers, jobbers or consumers, it is undisputable that they not only qualify as a "retail merchant" but meet every requirement set forth in the statutory definition of a "retailer," they carrying on retail businesses as retail storekeepers and exclusively purchasing as retailers, reselling as retailers and engaging in retail activities "with the object of * * * economic benefit either direct or indirect," if not of "gain." It is therefore evident that the only part of the requirement of a wholesaler which the case of the taxpayer in selling to them could have failed to meet is that contained in the adjective "licensed," his sales not being made to retail merchants licensed under the Act.

The employment by the legislature of the adjective "licensed" to modify a purchasing retail merchant in wholesale sales to him in my opinion is susceptible to two reasonable constructions, one being confined to the state of being licensed in a strict statutory sense and to the implications arising from the requirements set forth in

section 21 of the Act that "any person who shall have * * * gross proceeds of sales upon which a privilege tax is imposed by this Act, as a condition precedent to engaging or continuing in such business, shall * * * obtain * * *, upon payment * * * of one dollar ($1.00), a license * * *" and the other being not so confined. In that the first readily has been adopted by the parties hereto as well as by my associates and the issues before this court having been raised under it, that construction will be considered first. Under it, the construed legislative intent would be that in order for the lower rate to be applicable the purchaser must appear to be a taxable person under the Act on subsequent retail resale, thereby preserving in a present wholesale sale the opportunity of collecting ultimately at the higher rate and where such opportunity is foreclosed by the unlicensed status of the purchaser under the Act to immediately assess the higher rate against the seller. So construed the Act would clearly not be a uniform excise tax law with respect to sales of tangible personal property sold for purposes of resale by a seller doing a regularly organized wholesale business, known to the trade as such.

The only possible explanation of why the purchasing post exchanges have an unlicensed status under the Act is because they are exempt on ultimate retail sale from taxation by the Constitution of the United States. Hence the status is merged with the constitutional exemption and is but one of its incidents. Under the construction being considered it is evident that the constitutional exemption would not only be disregarded by it but regarded as the basic reason for the higher assessment. The legislature would be construed as attempting to obtain on immediate sale that which would be constitutionally unobtainable on subsequent resale. Such would be the effect notwithstanding the fact that the unlicensed status under

338

the Act of purchasing post exchanges, induced by constitutional exemption, and what would be the opposing status of other purchasing retail merchants, induced by a license under the Act, have no bearing whatsoever upon their purchasing characters in immediate sales to them, but relate wholly to their respective nontaxable and taxable characters under the Act in subsequent resales, neither status affecting either the right or privilege of purchase. It would be the effect even though there is no real or substantial difference between their purchasing characters at the time of purchase, their purposes of buying being the same and the nature of their retail businesses substantially the same, and even though there is no reasonable or tenable distinction to be found in the facts that post exchanges exercised their right of purchase under authorized War Department regulations as a governmental function and other purchasing retail merchants would exercise their privilege of purchase under a license provided by the Act as a proprietary function.

"Governmental" is descriptive of the operative control of the Federal Government over post exchanges as its agencies in their performance of functions which, prior to their creation, normally were activities of proprietary interests for the convenience of the Government's armed forces wherever stationed or operating, whereas "proprietary" is descriptive of independent ownership and the conducting of private businesses in dealing with the general public, the difference being a matter of form and not of substance. A Territory or State cannot tax post exchanges as retail merchants, not because such federal agencies perform only governmental functions as an incident of their relationship to the Federal Government, but because they are parts of a department of the Government and to tax those parts would interfere with the constitutional exercise of federal powers in which the

States and their citizens as well as the Territory and its citizens are equally interested, the fundamental reason being that those powers have been delegated to the Federal Government for the common good and it may freely and constitutionally exercise them for the benefit of all. Neither can a Territory or State directly burden and impede the Government in its operation of a federal agency, engaged in a trading business normally that of proprietary interests, in a considerably larger proportion than proprietary trading businesses of the same character. In this connection a recent case of the Supreme Court of the United States forcibly brought out that "considerations bearing upon taxation by the States of activities or agencies of the federal government are not correlative with the considerations bearing upon federal taxation of State agencies or activities." It rejected "as untenable the distinction between 'governmental' and 'proprietary' interests," stressed by its older cases, and upheld the validity of a nondiscriminatory federal tax upon a State engaged in the business of bottling mineral water, even though such business is conceived by the State to be for the public benefit and "has relation to its conservation policy." (*New York et al* v. *United States*, 90 L. ed. 265, 268, 270, decided Jan. 14, 1946. See *South Carolina* v. *United States*, 199 U. S. 437, 50 L. ed. 261; *Helvering* v. *Powers*, 293 U. S. 214, 79 L. ed. 291; *Allen* v. *Regents*, 304 U. S. 439, 82 L. ed. 1448.)

There being no real or substantial difference between the actual character as purchasers of post exchanges and other retail merchants, licensed under the Act, nor a reasonable or tenable distinction between the nature of their retail business and the purposes and functions of buying at the time of purchase, it follows that there is none between sales to them when made for purposes of resale as was by the taxpayer while doing a regularly organized

wholesale business known to the trade as such, the character of the seller, that of the merchandise sold and that of the subjects taxed being the same. Nor is such state of equality disturbed by the apparent equal treatment under the Act with respect to sales for purposes of resale to constitutionally exempt purchasers and those exempted by the Act itself, post exchanges and other retail merchants, licensed under the Act, constituting a class beyond and without the classifications of those exempted by the Act. The legislature may with the approval of Congress exempt any otherwise taxable person and has the power to withdraw the exemption granted either in whole or in part at any time within its discretion as dictated by the equitable and economic necessities of the case. Presumably pursuant thereto, the legislature by enacting Act 141 has with one hand in effect extended exemptions to certain otherwise taxable persons as well as to public utilities of the Territory and its subdivisions and with the other hand partly withheld the full force of such exemptions from such persons as well as impliedly consenting thereto with respect to such public utilities. However, it cannot withdraw nor effectively consent to that which it did not give. Neither can it take away any part of an immunity impliedly granted under the Constitution. The considerations with respect to persons exempted by the Act thus have no relation to those exempted under the Constitution and the fact that the Act would happen to operate equally with respect to sales to them is immaterial. It is only with respect to the unequal operation of the Act, as construed, towards substantially the same purchasers, who are not exempted by the Act and constitute no part of the Territory, that this court should be concerned. The question, therefore, is whether, as contended by the taxpayer, the assessment of the higher rate with respect to sales to post exchanges which are constitutionally exempt

on resale, when the lower rate is assessed with respect to sales to such other retail merchants not so exempt, would constitute a discriminatory tax that directly trespasses upon the immunity impliedly afforded by the Constitution to post exchanges and renders the legislative authority to assess at the higher rate unconstitutional and invalid.

In considering this question the practical operation and effect of the Act under the considered construction at the time of purchase must be determined. It is obvious that the Act would operate to tax gross proceeds of sales to post exchanges at a rate six times greater than that which would be assessed against those to other retail merchants and by so doing would impose upon post exchanges in the exercise of their right of purchase a relatively greater burden than that upon the others in the exercise of their privilege of purchase. In addition, it would place an excessive burden upon the right of purchase of post exchanges that would not be imposed had they not been clothed with an implied constitutional immunity. It likewise is obvious that the effect thereof directly would tend to discourage sales to post exchanges while encouraging those to other retail merchants. Such treatment unquestionably would be unfair and injurious to post exchanges. It would be so marked, in my opinion, as to transcend that which is merely impolitic or improvident. It justifies the inference that the Act as construed would be unfriendly in design, favoring forms of proprietary retail businesses within the Territory which are in competition to government retail businesses. Therefore it is clear to me that such an ununiform excise tax law would be discriminatory in so far as the exercise of the right of purchase by post exchanges is concerned. This, however, would not be a matter of legislative intent to single out post exchanges nor dependent upon a hostile attitude by the legislature towards them but the result of the construed

legislative intent to realize the highest amount of revenue possible under the Act, which is ordinarily the motive behind discriminatory legislation, and the actual operation in affecting a method for making the higher precentage rate applicable in lieu of the lower.

Discrimination is synonymous with an unreasonable distinction. It is the antithesis of fairness. It means, in this case, the unfair placing of an excess of burden upon the right of purchase of post exchanges not placed upon the corresponding privilege of purchase of other retail merchants and which would not be placed with respect to post exchanges had they not been constitutionally exempted from the correlative tax at the higher rate on resale. The Act thus would treat more harshly a right which the Territory did not give than a privilege extended by it. Had the purchasing post exchanges not been so exempt, the only rate that would be assessable against them under the Act would be the higher percentage rate. In that case, the Act would operate uniformly and nondiscriminately towards them and other retail merchants. However, such is not the case. Post exchanges are so exempt and under the considered construction the Act without uniformity would operate discriminately towards them in favor of the others, operating in disregard of constitutional immunity of post exchanges and making such immunity the basis of its discriminatory assessment on sales to them. The attendant unfairness and favoritism thereof on immediate sales to such purchasers would not be cured by the effect of the Act's unequal operation upon their divergent states of taxability on subsequent resales by them nor is it an answer to say that the two inequalities would give an overall tax burden to the other purchasing retail merchants that would be greater by a relative one-quarter per cent than that of post exchanges. The obvious answer is that such a burden upon the other

retail merchants should be proportionately greater by a relative one and one-half per cent if the constitutional exemption of post exchanges from that rate is to be justly respected. However, it is not for this court to indulge in mathematical speculations or attempt to balance differences in the overall ultimate burdens of purchasers who are substantially the same, but it should confine itself to the question at hand respecting the particular and immediate sales under consideration where there undeniably would be a marked excess of burden inflicted upon the right of purchase of post exchanges not imposed upon the comparable privilege of other retail merchants nor would be inflicted had the purchasing post exchanges not been constitutionally exempt. Therein lies the discriminatory character of the assessment in this case, there being at the time of purchase no real or substantial difference nor reasonable or tenable distinction between the actual purchasing character, retail business, purpose and function of buying of post exchanges and those of the other retail merchants.

As stated by Mr. Justice Frankfurter in rendering the opinion of the Court in *New York et al.* v. *United States, supra,* at page 271 of volume 90 of the Law Edition of United States Reports: "* * * 'discrimination' is not a code of specifics but a continuous process of application" and as pointed out by Mr. Justice Holmes in his dissenting opinion in the *Panhandle Oil Co.* case (the dissent being later in effect sustained) at page 223 of volume 277 of United States Reports, "* * * this Court which so often has defeated the attempt to tax in certain ways can defeat an attempt to discriminate or otherwise go too far without wholly abolishing the power to tax. The power to tax is not the power to destroy while this Court sits. The power to fix rates is the power to destroy if unlimited, but this Court while it endeavors to prevent confiscation

does not prevent the fixing of rates." Thus, discrimination being a continuous process of application, it follows that if the Territory has the power to fix a discriminatory rate with respect to sales to post exchanges substantially higher than with those to other retail merchants it could fix one still higher and so could the States, thereby effectively expelling post exchanges from territorial and state limits, drying up at its source the necessary flow of merchandise and rendering post exchanges unable to function in defeat of the purpose for which they were created. It is evident therefrom that the power to fix a discriminatory rate is unlimited and hence the power which destroys. This court, in my opinion, should therefore defeat such an attempt to discriminate and prevent the confiscatory assessment from being applied, the pertinent issue under the considered construction being whether the assessment made by the tax commissioner would trespass upon the implied constitutional immunity of post exchanges as an immediate or direct interference with the Government's constitutional powers to operate them under the Constitution. (Const. Art. I, § 8.)

The pith of the majority decision of the *Panhandle Oil Co.* case is that any state tax on sales to a federal agency, regardless of the character and degree of interference of that tax with government, is unconstitutional and invalid because it infringes upon the implied constitutional immunity of that purchasing agency to have the constitutional independence of the United States remain untrammeled in respect to such purchases, the stated reasons being that "It is immaterial that the seller and not the purchaser is required to report and make payment to the State. Sale and purchase constitute a transaction by which the tax is measured and on which the burden rests" and "The necessary operation of these enactments when so construed is directly to retard, impede and burden the

exertion by the United States of its constitutional powers" to operate such agency. (*Panhandle Oil Co.* v. *Knox*, 277 U. S. 218, 222.) What proved to be the case's point of vulnerability, however, is that it went too far and invalidated a nondiscriminatory tax. In his dissent thereto, Mr. Justice Holmes pointed to the ground upon which the cases of *James* v. *Dravo Contracting Co.*, *Alabama* v. *King & Boozer*, *Curry* v. *United States* and *Penn Dairies* v. *Milk Control Commission*, all *supra*, subsequently overruled its broad holding. This ground he stated at page 225 of volume 277, *supra*, in the closing sentence of his dissent as follows: "The question of interference with Government, I repeat, is one of unreasonableness and degree and it seems to me that the interference in this case [*i. e.*, that of a nondiscriminatory tax] is too remote." The bracketed explanation is supplied by me not only by reason of an analysis of the enactments considered in the *Panhandle Oil Co.* case but from the only authority cited by Mr. Justice Holmes in support of the stated ground of dissent. This authority is the case of *Metcalf & Eddy* v. *Mitchell*, 269 U. S. 514, wherein the Supreme Court declared on pages 524 and 525 thereof that "The tax is imposed without discrimination upon income whether derived from services rendered to the State or services rendered to private individuals. In such a situation it cannot be said that the tax is imposed upon an agency of government in any technical sense, and the tax itself cannot be deemed to be an interference with Government, or an impairment of the efficiency of its agencies in any substantial way." The reasoning for such a ground is found in the following language of Mr. Justice Holmes' dissent at page 224 of volume 277, *supra*: "To come down more closely to the question before us, when the Government comes into a State to purchase I do not perceive why it should be entitled to stand differently from any other purchaser. It

avails itself of the machinery furnished by the State and I do not see why it should not contribute in the same proportion that every other purchaser contributes for the privileges that it uses."

The *Dravo* case in holding that a nondiscriminatory state tax upon gross receipts from a contract with the Federal Government is not unconstitutional as a paid tax on the contract itself or as otherwise directly burdening the Government rested its decision squarely upon the authority of the *Metcalf & Eddy* case, at pages 156 and 157 of volume 302 of United States Reports, and thus adopted the ground upon which Mr. Justice Holmes dissented. Likewise the *King & Boozer* case, in deciding that the view prevailing in the *Panhandle Oil Co.* case and its line of cases that a nondiscriminatory tax on sales to a federal agency is unconstitutional has ceased to be tenable, cited as the leading case that of *Metcalf & Eddy* and relied on the *Dravo* case. Also the *Curry* case, companion to that of *King & Boozer*, rested its decision on the *King & Boozer* case. Furthermore the *Penn Dairies* case at page 269 of volume 318 of United States Reports, in deciding that "the mere fact that nondiscriminatory taxation of the contractor imposes an increased economic burden on the Government is no longer regarded as bringing the contractor within any implied immunity of the Government from state taxation or regulation," relied upon the *Metcalf & Eddy, Dravo* and *King & Boozer* cases. Thus the pivotable point of these cases in overruling the one of *Panhandle Oil Co.* is the nondiscriminatory character of the taxes upheld by them. They lay down the general rule that there is no implied constitutional immunity of the Government and its agencies from nondiscriminatory state taxation upon persons dealing with them, the converse thereof by necessary implication being that there is such an immunity from discriminatory state taxation.

By making no distinction whatsoever in the character of the state tax enactments considered and none in the degree of interference with government, it stands to reason that the majority opinion of the *Panhandle Oil Co.* case (which condemned as unconstitutional an operation of statute that was in fact equally disposed to purchasing federal agencies and all other purchasers and passed upon them a fair economic burden, incidental and normal, involving but a remote interference with government) necessarily included within its condemnation an unfair and injurious operation to purchasing federal agencies that passes to them an excessive economic burden not borne by other competitive purchasers and would not be borne by the federal agencies had they not been exempt under the Constitution, which is proximate and abnormal involving a direct and destructive interference with government. The significance of such inclusion is brought into bold relief by the overruling of that majority opinion, which in effect removed nondiscriminatory state taxes from the otherwise authoritative holding of the *Panhandle Oil Co.* case. It is evident that it was overruled only with respect to such taxes and their lower degree of interference with government, the overruling thereby being limited to that character of taxes and degree and not affecting the majority opinion with respect to discriminatory taxes and their higher degree of interference with government. It is apparent, therefore, that the reasoning of the majority opinion in the *Panhandle Oil Co.* case, advanced by the court to establish a direct interference with government, is unimpaired when applied to a discriminatory tax and hence controls the question presented, decisive of the pertinent issue, that a discriminatory tax directly impedes, retards and burdens the constitutional exercise of the powers of the Government to maintain its agencies. Thus the *Panhandle Oil Co.* case, construed in the light of the

implied converse of the rule, subsequently laid down by the Supreme Court, as well as in the light of the considerations of fair dealing and equality which have been the philosophy of this nation since its inception, is an authority for the rule of law that a discriminatory tax by State or Territory upon sales to a federal agency is unconstitutional and invalid as a direct infringement upon the constitutional exercise of the powers of the United States to operate such an agency. This authority is squarely in point. There is no need, therefore, to go further by way of analogy and draw a parallel of corresponding effect from the wealth of authorities pertaining to the unconstitutionality of including other forms of implied constitutional immunity within the measure of a tax (see *Missouri* v. *Gehner*, 281 U. S. 313, 74 L. ed. 870; *Nat'l Life Ins. Co.* v. *United States*, 277 U. S. 508, 72 L. ed. 968; *Miller* v. *Milwaukee*, 272 U. S. 713, 71 L. ed. 487; *Northwestern Ins. Co.* v. *Wisconsin*, 275 U. S. 136, 72 L. ed. 203; *Macallen Co.* v. *Massachusetts*, 279 U. S. 620, 73 L. ed. 874), or to the unconstitutional discrimination, violative of the guarantee of "equal protection of the laws" under the Fourteenth Amendment of the Constitution, of making the character of the taxpayer exercising a privilege the basis for a higher tax than that upon competitive others under similar circumstances exercising the same privilege. (See *Southern Railway Co.* v. *Greene*, 216 U. S. 400, 54 L. ed. 536; *Bethlehem Motors Co.* v. *Flynt*, 256 U. S. 421, 65 L. ed. 1029; *Quaker City Cab Co.* v. *Penna.*, 277 U. S. 389, 72 L. ed. 927; *Concordia Fire Ins. Co.* v. *Illinois*, 292 U. S. 535, 78 L. ed. 1141.)

For the reasons assigned herein the discriminatory assessment at the higher rate with respect to the case of the taxpayer in selling to post exchanges is the direct result of the statutory construction considered. It renders, in my opinion, the assessment thereof unconstitutional and

invalid. I cannot perceive, however, that the legislature intended to enact a void provision, it being presumed to intend that which is constitutional and valid. To my mind the legislature intended to enact a uniform excise tax law without discrimination.

The employment by the legislature of the adjective "licensed" in modifying the purchasing "retail merchant" in order to make applicable the lower rate to the case of a wholesaler is susceptible to a more reasonable and less narrow construction and which is not confined wholly to the strict statutory sense of the adjective in securing a license under the Act. It is that the purchaser must be a retail merchant who is lawfully permitted by proper authority to carry on a retail business within the Territory which without such permission would be illegal. In this connection it is significant that the Act defines neither the adjective "licensed" nor the noun "license." Hence the plain, ordinary and accepted meaning of the adjective must be taken as the one intended. This meaning is that a licensed purchaser is one who has "Authority or liberty given to do or forbear any act; permission to do something (specified) ; esp., a formal permission from the proper authorities to perform certain acts or to carry on a certain business which without such permission would be illegal; also, the document embodying such permission * * *." (Webster's International Dictionary, 2d ed.) Applying it to the facts concerning post exchanges, it is very evident that they come completely within it. They have the permission in the form of Army Regulations of the War Department, pursuant to congressional enactments (16 Stat. 315, 319; 18 Stat. 337), to carry on retail businesses within the Territory from the United States as the proper authority under the Constitution, the authorized War Department regulations being the document embodying such permission and having the force of law. Post exchanges

are therefore duly licensed retail merchants. Any contention of difference between them and the other retail merchants would be purely fanciful, nor can it be reasonably argued that the legislature ever intended to classify wholesale sales made to retail merchants, duly licensed within the Territory by the War Department in accordance with federal law under the Constitution, differently from those made to retail merchants duly licensed by the tax commissioner in accordance with territorial law under the Act, both purchasers being retailers who are equally law abiding.

Construing the adjective "licensed" in conformity with its plain, ordinary and accepted meaning, the Act is a uniform excise tax law with respect to wholesale sales and operates without discrimination in making applicable the lower rate to the case of a wholesaler. It does so equitably with respect to wholesale sales made to all licensed retail merchants within the Territory, regardless of the source of the purchasers' permission to carry on retail businesses therein so long as it is derived from a proper authority and without such permission the conduct thereof would be illegal. Thus construed the Act does not infringe upon or disregard the implied constitutional immunity of purchasing post exchanges engaged in the retail business in the exercise of their right to buy at wholesale within the Territory for purposes of resale. The resultant economic burden passed to them is a remote and fair one as a normal incident of the tax which rests in the same proportion upon all purchasers similarly engaged and exercising comparable rights or privileges who are not exempted by the Act and constitute no part of the Territory, the validity of the tax so assessed at the lower rate not being dependent upon that burden's ultimate resting place. It is well settled that such a nondiscriminatory assessment of a uniform excise tax is constitutional and valid. (*James* v.

*Dravo Contracting Co., Alabama* v. *King & Boozer, Curry* v. *United States, Penn Dairies* v. *Milk Control Comm'n.,* all *supra; Western L. Co.* v. *State Board of Equalization,* 11 Calif. [2d] 156, 78 P. [2d] 731; *Federal Land Bank* v. *DeRochford,* 69 N. D. 382, 297 N.W. 522; *Compress of Union* v. *Stone,* 188 Miss. 49, 193 So. 329.) In my opinion this reasonable construction reflects the true legislative intent of the Act, consonant with its constitutionality and validity, and should be adopted.

I concur in the result of the majority opinion with respect to the tax upon the taxpayer's gross proceeds of sales, made for use and consumption, to the United States but dissent therefrom for the reasons stated with respect to the other tax upon his sales, made for purposes of resale, to post exchanges.

In my opinion the cause should be remanded below with instructions to set aside the judgments and enter ones in favor of the taxpayer for recovery of the excess of the tax paid over the assessment at the rate of one quarter of one per cent against his gross proceeds of post exchange sales.